[No. B009312. Second Dist., Div. Seven. Mar. 11, 1986.]

JIMMY D. MOORE, Plaintiff and Respondent, v.
PREVENTIVE MEDICINE MEDICAL GROUP, INC.,
Defendant and Appellant.

COUNSEL

Hillsinger & Costanzo, Horvitz & Levy, Barry R. Levy, David M. Axelrad and Daniel J. Gonzalez for Defendant and Appellant.

Schlothauer & Ellison, William H. Newkirk and Al Schallau for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—The appellant appeals from a judgment rendered against it in a medical malpractice case. It contends the judgment should be reversed since the trial court committed several errors in instructing the jury and the

jury committed several acts of misconduct which deprived the appellant of a fair trial.

## STATEMENT OF FACTS AND PROCEDURE BELOW

In 1977, the respondent, Moore, was an actor and real estate salesman. His acting credits included television and magazine advertisements, television shows, and theater and minor film productions. He was a member of the Screen Actor's Guild. Through the guild, he learned the appellant, the Preventive Medicine Medical Group (PMMG), offered a physical examination for about $100.

On November 10, 1977, Moore went to the PMMG for an examination. He did not have any specific complaints but had noticed a slight blurring of vision. He was given a battery of tests. At the end of the examination, he made an appointment for a followup consultation.

Moore returned to the facilities on December 8, 1977. He saw an internist, Dr. Mason. Dr. Mason went over the results of the previous examination. During this time, Moore told the doctor about a spot he had noticed on his ear lobe. He asked the doctor if it was anything to be concerned about. Dr. Mason looked at the spot and felt it. The doctor observed it was a very small skin lesion. It was about two to three millimeters in size. He told Moore it was a mole. He strongly recommended he see a specialist. He further told him all pigmented skin lesions are suspicious in nature and until he got it removed or studied microscopically, its exact nature wouldn't be known.[1]

Moore did not immediately heed Mason's advice. However, on April 20, 1978, he went to see Dr. David, a dermatologist. His central concern was a rash he had on the back of his leg which was causing him trouble. While he was at the doctor's office, Moore told him about the spot on his ear. The doctor look at the spot and told Moore it should be removed immediately for a biopsy. The doctor removed it on April 24, 1978.

David sent the biopsy specimen to a lab. It was put on a slide and sent back to him. When he examined it, it looked cancerous. He sent it to a pathologist for a consultation. The pathologist agreed with David's diagnosis.

---

[1]This scenario is based on Mason's trial testimony. Moore testified Mason looked at the spot on his ear and felt it, but told him it was nothing to be concerned about.

David discussed the matter with Dr. Wagner, a surgeon. He sent him the pathologist's report and the slide of the mole. David discussed the matter with Moore. He told him the biopsy came back and it was malignant melanoma. The doctor referred him to Wagner. Moore went to see Wagner about two days after this visit.

Wagner first saw Moore on May 15, 1978. Based on the pathology report and his evaluation of Moore, Wagner determined surgery was necessary. He determined he would have to remove part of Moore's left ear, along with the glands in front of the ear and in the upper neck on the same side. He also decided to remove the lymph nodes because of fear the cancer spread to them.

Wagner operated on May 25, 1978. An analysis of the removed tissues showed no evidence of any melanoma. As a result of the surgery, the lower third of Moore's left ear was removed and there is a slight depression right below the cheek. He suffers from numbness on the left side of his face and discoloration in his chin and cheek. When Moore is extremely tired, his left eye and the corner of his mouth will droop slightly. He is embarrassed by his physical appearance.

Due to his appearance, Moore has not attempted to do any modeling, commercials, or acting since 1980.[2]

On June 25, 1979, Moore filed a complaint for personal injuries and medical malpractice against PMMG and Dr. Mason. The gravamen of the complaint was the defendants failed to adequately examine and diagnose Moore's cancerous conditions. In particular, the defendants failed to adequately warn Moore of the potential dangers associated with a mole of the type he exhibited and the repercussions if he didn't have the mole properly diagnosed.

Dr. Mason subsequently settled out-of-court with Moore for $5,000.

The case was tried before a jury in June 1984. The jury returned a verdict on June 22, 1984. The jury found PMMG was negligent, the negligence was a legal cause of the injury to the plaintiff, Moore was also negligent, his negligence was a legal cause of his injury, the total amount of Moore's injury was $733,000, and PMMG was 75 percent responsible while Moore was 25 percent responsible.

---

[2]As will be discussed *infra,* Moore's agent testified a perfect appearance is necessary to be a model or do commercials. Since that time, Moore has solely been involved in business activities.

On July 20, 1984, PMMG filed a motion for judgment notwithstanding the verdict or, in the alternative, motion for a new trial. Among the arguments raised by PMMG was that jury misconduct prejudiced PMMG's right to a fair trial and the trial court committed prejudicial error in instructing the jury. PMMG submitted juror declarations from three jurors to establish the acts of jury misconduct. Moore did not file counteraffidavits.

Both of PMMG's motions were denied on August 24, 1984.

PMMG filed a notice of appeal on September 21, 1984.

I. THE TRIAL COURT DID NOT ERR IN GIVING AN INSTRUCTION DEFINING DR. MASON'S DUTY OF DISCLOSURE.

PMMG contends the trial court erred in giving the jury BAJI No. 6.11.5.[3] PMMG argues the instruction was erroneously given since by its terms it applies to doctors who provide diagnosis or treatment, not to doctors such as Mason who simply refer patients to specialists. Moreover, it was a question of fact whether Mason's advice to Moore was adequate, yet by instructing the jury in this manner, the court implicitly instructed them Mason had an affirmative duty to tell Moore about the potential cancer and the risks involved if he failed to see a specialist about the mole.

In *Truman v. Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902], the Supreme Court established what has been termed the "informed refusal" doctrine. This doctrine describes a physician's responsibilities to a patient when that patient refuses diagnostic testing before a diagnosis is made and treatment recommended. In a nutshell, a doctor has a duty to disclose all material information to his patient which will enable that patient to make an informed decision regarding the taking or refusal to take such a test.

---

[3]This instruction provides:

"It is the duty of a physician to disclose to his patient all material information to enable the patient to make an informed decision regarding the taking or refusal to take a diagnostic test.

"Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the diagnostic test or procedure. To be material a fact must also be one which is not commonly appreciated.

"Failure of the physician to disclose to his patient all material information, including the risk to the patient if the test is refused, renders the physician liable for any injury, the legal cause of which was the patient's refusal to take the test if a reasonable and prudent person in the patient's position would not have refused the test if all material information had been given."

In *Truman,* the respondent was the Truman's family doctor. He saw the appellant frequently for a six-year period. During that period, the doctor on several occasions informed Truman she should have a pap smear. She refused to take the test since she could not afford the cost. The doctor never informed Truman of the potential consequences of failing to take a pap smear, i.e., fatal cervical cancer. In April 1969, Truman contacted a urologist. Based on his examination, he made an appointment for her to see a gynecologist. The gynecologist subsequently discovered a cancerous tumor had largely replaced her cervix. Although treatment was attempted, Truman died as a result of this cancer. Her children brought a wrongful death action against the doctor arguing the failure of the doctor to give a pap smear proximately caused Truman's death. In instructing the jury, the trial court refused to give the appellants' proposed instruction based on the theory of informed refusal. The jury returned a verdict finding Thomas free of any negligence. The appellate court affirmed.

The Supreme Court, in reversing the decision, concluded a jury could properly find Thomas breached his duty of care when he failed to inform Truman of the consequences of failing to take a pap smear and the appellants' proposed instruction should have been given. In describing a physician's duty of care in this context, the court stated: ". . . [a] physician recommending a risk-free procedure [whether for treatment or diagnosis] may safely forego discussion beyond that necessary to conform to competent medical practice and to obtain the patient's consent. [Citation omitted.] If a patient indicates that he or she is going to *decline* the risk-free test or treatment, then the doctor has the additional duty of advising of all material risks of which a reasonable person would want to be informed before deciding not to undergo the procedure." (*Truman* v. *Thomas, supra,* 27 Cal.3d at p. 292.)

In making its analysis, the court relied substantially on the principles established in *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], the case in which the court established the "informed consent" doctrine. In this case, the court held "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.,* at p. 243.) This holding was based on four essential postulates. First, the knowledge of patient and doctor are not in parity. Second, an adult of sound mind exercises control over his own body and, in exercising this control, has the right to determine whether or not to undergo medical treatment. Third, a patient's consent to a proposed treatment must be an informed one. Fourth, due to the nature of the physician-patient relationship, the physician has an obligation to the

patient which transcends arms-length transactions. Based on these postulates, a physician has a duty to inform his patient of all information necessary to make a knowledgeable decision concerning a proposed treatment. (*Id.*, at p. 242.) Moreover, the court refused to measure the scope of the duty to inform by a community professional standard. (*Id.*, at pp. 243-245.) "[T]he test for determining whether a potential peril must be divulged is its materiality to the patient's decision. (*Id.*, at p. 245.)

■ The challenged instruction in the case at bar was based on the holding in *Truman*. PMMG contends although the instruction is accurate in describing the principles of law established in *Truman*, it was not applicable to the facts of this case. As PMMG argues, *Truman* involved a case in which a patient refused a recommended procedure and her treating physician knew it. In the case at bar, Mason was merely the referring physician and had no reason to suppose Moore would not take his advice to see a specialist. While we recognize these factual distinctions, we reject PMMG's challenge.

We believe the rationale underlying the holdings in *Cobbs* and *Truman* compels us to conclude Mason had a duty to disclose to Moore all material information which would enable Moore to make an informed decision whether to see the specialist or not.[4] Such material information included the risk to Moore if he was not examined by the specialist.[5] Without knowledge of such risks, Moore was not in a position to make an informed decision concerning the doctor's recommendation. The fact Mason was not going to do the actual diagnosis underscores the importance of relaying this information to Moore at the time of his visit. Mason would not learn whether Moore went to the specialist or refused to heed his advice. Indeed, Moore in essence rejected the testing proposed by Mason when he failed to go see the specialist as recommended by Mason.[6] However, at that point, Mason was no longer in a position to impress upon Moore the significance of his decision not to take his advice. Thus, although the case at bar is factually distinguishable from *Truman*, we fail to see how such distinction should be

---

[4]This is not a case in which no diagnostic testing was recommended. (Compare *Jamison v. Lindsay* (1980) 108 Cal.App.3d 223, 230-231 [166 Cal.Rptr. 443].) As Mason testified, he told Moore the mole should be removed or studied microscopically so that it could be properly diagnosed.

[5]PMMG contends the link between the recent appearance of a skin growth like a mole and skin cancer is a matter of common knowledge. PMMG cites no support in the record for this position. Indeed, one of Moore's expert witnesses testified to the opposite conclusion.

[6]When Moore went to see the dermatologist, it was not because of the mole on his ear. He went to see him because he had a rash on the back of his leg. While being examined, Moore commented about the spot on his ear.

of legal significance. Mason failed to disclose to Moore the risk he faced if he failed to have his mole properly tested.[7] Yet, Mason knew he would not have another opportunity to discuss with Moore the seriousness of this decision. Thus, it was incumbent on Mason to provide Moore this information during his visit so Moore could make an informed decision. Clearly if Mason had had the capability to conduct a diagnosis on Moore and Moore had refused, the principles of *Truman* would have applied. We do not believe a different result should occur simply because a referring physician is not in a position to ever learn whether a proposed test was refused. (See also *Gates v. Jensen* (1979) 92 Wn.2d 246 [595 P.2d 919, 923] ["The physician's duty of disclosure arises . . . whenever the doctor becomes aware of an abnormality which may indicate risk or danger. [Citation omitted.] The facts which must be disclosed are all those facts the physician knows or should know which the patient needs in order to make the decision [regarding the course which the patient's medical care will take]. To require less would be to deprive the patient of the capacity to choose the course his or her life will take."]; accord *Keogan* v. *Holy Family Hospital* (1980) 95 Wn.2d 306 [622 P.2d 1246].)

■ We agree with PMMG's contention that by instructing the jury in this manner, the jury was obligated to find Mason negligent if it found Mason had failed to disclose to Moore all material information necessary to make an informed decision including the risk to Moore if he failed to undergo the proposed testing. However, as discussed above, we believe such a result was an appropriate one. The failure of Mason to disclose material information to Moore rendered Mason liable for any injuries legally caused by Moore's subsequent refusal to submit to testing. It was of course a factual matter for the jury to determine whether Mason had indeed failed to disclose material information. However, no recourse to the standards of practice among the medical profession was required. (See *Cobbs* v. *Grant, supra,* 8 Cal.3d at p. 243 ["The scope of the physician's communications to the patient . . . must be measured by the patient's need, and the need is whatever information is material to the decision. Thus the test for determining whether a potential peril must be divulged is its materiality to the patient's decision."]; *Miller* v. *Kennedy* (1974) 11 Wn.App. 272 [522 P.2d 852, 862], adopted in full by the Washington Supreme Court at 85 Wn.2d 151 [530 P.2d 334] ["Once it has been established by expert medical testimony that a risk existed, then the existence of the risk is the patient's business; and it is not for the medical profession to establish a criteria for the dissemination of information to the patient based upon what doctors feel the patient should be told."].)

---

[7]Mason did not even testify he believed Moore understood the nature of the risk he faced.

The trial court properly instructed the jury in this regard.

## II. Reversal Is Not Required Due to Jury Misconduct

In the case at bar, PMMG submitted three sworn juror declarations alleging numerous instances of jury misconduct. It contends, based on these declarations, it was denied a fair trial such that reversal is required. ■ ■ ■ ■ ■ We disagree.[8]

A. *The Declarations Did Not Establish an Agreement by the Jury to Include Attorney's Fees and Taxes in the Recovery.*

■ PMMG contends the jury improperly considered the amount of attorney's fees and taxes Moore would be forced to pay out of any award he recovered when it was deciding the amount of compensation he should receive. In making this argument, PMMG emphasizes the declaration of Judith Montoya. In her declaration, Montoya stated a juror raised the issue of the amount of any award which Moore would have to pay to his attorney in attorney's fees. Taking into account the attorney's probable percentage of the recovery and taxes Moore would have to pay, the juror stated the amount of award given to Moore should be about a million dollars. Another juror stated 40 percent of any award would probably go to Moore's attorney. However, to establish misconduct requiring reversal, juror declarations must establish "[a]n express agreement by the jurors to include such fees in their verdict, or extensive discussion evidencing an implied agreement to that effect." (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022]; accord *Tramell* v. *McDonnell Douglas Corp.* (1984) 163 Cal.App.3d 157, 172 [209 Cal.Rptr. 427].) The declarations in the case at bar do not meet this requirement. The declarants do not suggest an ex-

---

[8]We do agree, however, these declarations were properly admissible for the purpose of raising the issue of jury misconduct. Evidence Code section 1150 provides the standards for the admissibility of juror declarations. In interpreting this provision, the Supreme Court in *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132] stated, this section distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . ." Only declarations of the former can properly be considered. Thus, improper influences "open to sight, hearing, and the other senses and thus subject to corroboration [citation omitted]," can be proved under this section. (*Id.*, at p. 350.) While certain aspects of the submitted declarations did not satisfy the requirements of section 1150, in all essential respects they complied with the requirements discussed above.

We also note Moore did not submit counter declarations. Thus the acts alleged in PMMG's declarations are deemed admitted. (See *Tapia* v. *Barker* (1984) 160 Cal.App.3d 761, 766 [206 Cal.Rptr. 803].)

press agreement was reached and the discussion they relate could hardly be characterized as extensive.[9]

B. *A Juror's Statement That the Award for Pain and Suffering Was Low in Comparison to the Awards in Unrelated Cases Does Not Require Reversal.*

 Montoya stated in her declaration a juror informed the other jurors that because of his previous knowledge of other malpractice suits, the $500,000 awarded Moore for pain and suffering was cheap. We are hard pressed to understand how such a statement could constitute reversible misconduct since in the same declaration Montoya stated the jury awarded Moore $500,000 for pain and suffering. Thus, the juror's statement concerning awards in other suits did not result in the jury giving Moore a higher award than planned.

PMMG contends certain jurors may have been concerned that $500,000 was too much for pain and suffering. However, upon learning this amount was not excessive when compared to awards given in other actions, they may have either been reassured or simply decided not to hold out for less. We find this contention to be mere speculation with no support in the submitted declarations. Moreover, this contention essentially asks us to examine jurors' subjective reasoning processes. This is not acceptable under Evidence Code section 1150.

C. *A Juror's Discussion About Her Own Physical Deformity and Its Effects Was Not Improper.*

 All the declarants state during deliberations relative to the jury's discussion about Moore's pain and suffering damages, the foreperson became very emotional. She discussed a physical deformity which she had previously never told anyone about. Moreover, she told them she knew about pain and suffering, and no amount of money could compensate her. PMMG contends the foreperson's discussion of her personal experience with the subject matter of the jury's deliberation was improper and the jury may have been improperly influenced by the foreperson's statements.

We do not believe the foreperson's comments warrant reversal. Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself. Jurors are expected to be fully

---

[9]We note the jury only awarded Moore $733,000. Thus the juror who recommended that the jury award Moore about one million dollars was not heeded.

functioning human beings, bringing diverse backgrounds and experiences to the matter before them. Indeed, the purpose of voir dire is to provide counsel the opportunity to learn about a prospective juror's background, experiences, and philosophy as it relates to the matter to be heard. In the case at bar, the foreperson was only asked a few questions on voir dire, all of them by Moore's counsel. With respect to the issue of pain and suffering, she was merely asked whether she would have any difficulty awarding money damages for pain and suffering if justified by the evidence. She replied she would not. The only question asked by PMMG's counsel which even indirectly touched on this issue was a question asked to all the prospective jurors as a whole. The jurors were asked if they could put aside natural sympathy, listen to the evidence objectively, and not reach a judgment by means of passion or prejudice. All the jurors agreed they could. We believe if PMMG did not desire jurors on the panel who had any personal experience with pain and suffering which they might relate during the jury's deliberations counsel for PMMG should have questioned the prospective jurors in this regard. It is inappropriate after-the-fact to complain about the particular background and experiences which a given juror brought to the deliberation process. Our conclusion would of course be different had the foreperson on voir dire denied any personal feelings relative to this issue. (Compare *Smith* v. *Covell* (1980) 100 Cal.App.3d 947, 952 [161 Cal.Rptr. 377]; see also *People* ex rel. *Dept. Pub. Wks.* v. *Curtis* (1967) 255 Cal.App.2d 378, 388-389 [63 Cal.Rptr. 138].)[10]

As the declarations establish, the foreperson was not the only juror to become emotional during this aspect of the deliberations. Declarants Montoya and Powell both state the deliberations in general became very heated and emotional. If jury deliberations involving delicate subjects such as pain and suffering damages were subject to attack every time particular jurors became emotionally charged, very few jury verdicts would be affirmed. (See *Tillery* v. *Richland* (1984) 158 Cal.App.3d 957, 977 [205 Cal.Rptr. 191].)

D. *The Jury Did Not Improperly Infer PMMG's Liability From Evidence Mason Entered Into an Out-of-court Settlement With Moore.*

PMMG contends certain of the jurors in the case at bar disregarded the trial court's admonition not to draw any inference of liability from evi-

---

[10]We note particularly in the context of pain and suffering deliberations, the personal background and experiences of the individual jurors will often exert a role in the deliberations. This is due to the nebulous nature of pain and suffering compensations. Indeed, as the trial court instructed the jury, "No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for pain and suffering, nor is the opinion of any witness required as to the amount of such reasonable compensation."

dence of Mason's out-of-court settlement. PMMG argues, given this misconduct, reversal is required.

Declarant Montoya states two jurors discussed Mason's settlement with Moore and concluded since PMMG was responsible for the actions of its employees, it must be guilty as well. Other jurors agreed with this position. However, declarant McCune reported a different version. He stated several jurors stated since Mason settled with Moore, this was an implication of guilt. Given Mason was an employee of PMMG, PMMG was inferred to be guilty. However, *this was to be decided by the jury.* A reasonable reading of McCune's declaration suggests that although several jurors felt PMMG's liability could be inferred from the fact that Mason settled, the jury recognized it had to decide the issue itself. Given this reading, the declarations were inconsistent on this issue. ▇ It is the role of the trial court to resolve an inconsistency in this regard. The court's decision will not be reversed on appeal absent a showing the trial court clearly abused its discretion. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795 [91 Cal.Rptr. 760, 478 P.2d 480].) No showing has been made in the case before us.

E. *A Juror Improperly Fashioned a Formula for Computing Damages for Injury to Moore's Future Capacity as a Real Estate Salesman.*

▇ In discussing the amount of award Moore should receive for future loss of earnings, one of the jurors fashioned a particular formula to arrive at the correct award of damages for loss of future income in the real estate field. This formula was not based on any evidence which had been presented during trial, but was derived from the juror's personal experience. The jury awarded Moore damages based on the application of this formula.

Such action on the part of the jury was inappropriate and Moore's award must be reduced by the amount he was awarded for loss of future income in the real estate industry. The declarations, however, are inconsistent as to the amount Moore was awarded. Declarant McCune states Moore was awarded $18,000 for the future loss of earnings in the real estate field. Declarant Montoya states Moore was awarded $48,000. We believe since the inconsistent declarations were both submitted by PMMG, PMMG should be bound by the figure least favorable to its position or $18,000.

III. THE TRIAL COURT DID NOT ERR IN INSTRUCTING THE JURY IT COULD AWARD MOORE DAMAGES FOR LOSS OF FUTURE EARNING CAPACITY SUFFERED AS A RESULT OF HIS INJURIES

▇ PMMG contends the jury should not have been instructed it could award damages for loss of future income since there was no evidence to

show PMMG was responsible for any harm to Moore's career as a model and an actor.[11] Indeed, PMMG contends, the evidence shows Moore's acting and modeling career would have been destroyed even had Mason informed Moore of the cancer risk and Moore acted immediately since surgery was inevitable.

"Even though an instruction is couched in proper language it is improper, if it finds no support in the evidence, and the giving of it constitutes prejudicial error if it is calculated to mislead the jury. [Citations.]" (*Davenport v. Stratton* (1944) 24 Cal.2d 232, 254 [149 P.2d 4]; accord *Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 370 [99 Cal.Rptr. 29, 491 P.2d 821].) However, "[a] party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may properly be drawn from the evidence." (*Western Decor & Furnishings Industries, Inc. v. Bank of America* (1979) 91 Cal.App.3d 293, 309 [154 Cal.Rptr. 287].) We find there was evidence in the record which supported the giving of this instruction.

Both parties agree that even at the time of Moore's examination by Mason, Moore's cancer was such that removal of all or part of Moore's ear lobe would have been required. Moreover, Moore's talent agent testified a person with any physical appearance disabilities or deformities would have no opportunities in commercials or modeling since a perfect appearance is required. PMMG contends this uncontroverted evidence demonstrates the jury instruction was inappropriate. However, Moore's talent agent also testified Moore could still pursue a career in straight acting, although his chances of getting a role would only be one out of ten. The roles would have to call for the type of deformity Moore suffered from. Moreover, Dr. Wagner, an expert witness for Moore, testified if the lesion found in Moore's ear lobe had been less than .75 millimeters, he would not have had to do the surgery to Moore's jaw. As discussed above, he still would have had to remove part of the ear or ear lobe, but could have done a skin graft. Thus, if Moore had been operated on sooner, the extent of his physical deformities would have been significantly reduced. As such, his opportunities in straight acting would have increased. Given this, the instruction was properly given.

---

[11]PMMG alleges Moore's claim for lost future earnings was limited to his future earnings as a model and actor. Although not critical to our decision, we do not believe the record substantiates this contention. For instance, the stipulation to this effect, offered by PMMG, was never accepted by opposing counsel. Moreover, while it is true that PMMG's counsel in his closing argument emphasized Moore's loss of earnings in his acting and modeling career, counsel never explicitly told the jury Moore's claim for loss of future earnings was limited to his acting and modeling career.

■ PMMG also contends the trial court should have expressly instructed the jury it should limit its award of damages to compensation for the incremental injury Moore may have suffered because of Mason's conduct. We disagree.

As a general rule, there is no duty to instruct in the absence of a specific request by a party. (*Agarwal* v. *Johnson* (1979) 25 Cal.3d 932, 951 [160 Cal.Rptr. 141, 603 P.2d 58].) PMMG did not request the above instruction. However, some courts have held a court has a duty to instruct sua sponte on the proper measure of damages. (*Pepper* v. *Underwood* (1975) 48 Cal.App.3d 698, 708-709 [122 Cal.Rptr. 343], disapproved on other grounds in *Stout* v. *Turney* (1978) 22 Cal.3d 718, 730 [150 Cal.Rptr. 637, 586 P.2d 1228]; see *Agarwal* v. *Johnson, supra,* 25 Cal.3d at p. 951.) Even if we assume a trial court has such a sua sponte duty, we believe the trial court satisfied this duty in the case at bar.

As the court instructed the jury, "The defendant has the burden of establishing by a preponderance of the evidence all of the facts necessary to prove the following issues: (1) that the plaintiff was negligent; and (2) that plaintiff's negligence contributed as a legal cause to the injury and damage claimed to have been suffered. . . . If, under the court's instructions, you find that the plaintiff is entitled to a verdict against the defendant, you must then award plaintiff damages in an amount that will reasonably compensate him for each of the following elements of claimed loss or harm, . . . *provided that you find that such harm or loss was or will be suffered by him and legally caused by the act or omission upon which you base your finding of liability.*" (Italics added.) Thus, the jury was specifically instructed Moore could only be compensated for harm or loss which was legally caused by Mason's act or omission. The trial court properly instructed the jury.[12]

■ PMMG also complains the jury did not segregate the elements of damages it awarded so it is unknown whether the jury actually awarded damages for lost future earning capacity. However, since PMMG submitted the special verdict form which the jury used and never objected to the form of the verdict as returned, it waived any right to challenge the actual form of the verdict. (*Lynch* v. *Birdwell* (1955) 44 Cal.2d 839, 851 [285 P.2d 919]; *Niles* v. *City of San Rafael* (1974) 42 Cal.App.3d 230, 239 [116 Cal.Rptr. 733].)

---

[12]Even had there been no evidentiary support for an award of damages for lost future earning capacity, this instruction would have cured any error. (See *Little* v. *Stuyvesant Life Ins. Co.* (1977) 67 Cal.App.3d 451, 466-468 [136 Cal.Rptr. 653].)

## IV. No Error Resulted Due to the Failure of the Jury Verdict to Distinguish Between Economic Losses and Noneconomic Losses

Civil Code section 3333.2 provides in relevant part, "(a) In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover non-economic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other non-pecuniary damage. (b) In no such action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." In the case at bar, the jury returned a verdict in the amount of $733,000. However, the jury did not distinguish between economic and noneconomic losses in its verdict. PMMG contends the trial court should have instructed the jury sua sponte that it had to segregate its award in the above manner. We disagree.

We believe it was incumbent on PMMG to request a special verdict form which would have required the jury to segregate the amounts in the manner it now desires. As discussed earlier, the special verdict form which the jury used was requested by PMMG. Even when the jury returned with its verdict, PMMG still did not object to its form. As such, PMMG has waived any objection to the form of the jury verdict. (*Lynch* v. *Birdwell, supra,* 44 Cal.2d at p. 851; *Wright* v. *Title Ins. & Trust Co.* (1969) 274 Cal.App.2d 252, 262 [79 Cal.Rptr. 12]; *Niles* v. *City of San Rafael, supra,* 42 Cal.App.3d at p. 240.) Such a position is also consistent with California Rules of Court, rule 230, which provides, "Whenever a party desires special findings by a jury, he shall, before argument, unless otherwise ordered, present to the judge in writing the issues or questions of fact upon which such findings are requested, in proper form for submission to the jury, and serve copies thereof upon all other parties."

We find the authority relied upon by PMMG distinguishable. For instance in *Pressler* v. *Irvine Drugs, Inc.* (1985) 169 Cal.App.3d 1244 [215 Cal.Rptr. 807], a case involving Civil Code section 3333.2, defense counsel asked the trial court how the Civil Code section 3333.2 affirmative defense should be handled *prior to final argument.* Counsel also submitted special interrogatories relative to this section before the jury retired. Given these action, the appellate court expressly concluded counsel had not waived its client's right to the section's required reduction. (*Id.,* at pp. 1248-1249.)[13]

---

[13]In *Pressler,* the court did not accept counsel's special interrogatories because they were confusing. The court decided accurate interrogatories did not have to be prepared until the jury returned and the court was faced with a net award in excess of $250,000. The court was concerned about the constitutionality of section 3333.2 and didn't want to address this issue if unnecessary. (*Ibid.*)

*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233], discussed in *Pressler* and relied upon by PMMG is also distinguishable. The central issue in that case was whether Code of Civil Procedure section 667.7 is constitutional.[14] The trial court had ruled it was unconstitutional. The Supreme Court disagreed. (*Id.,* at pp. 368-378.) The issue addressed by the court of relevance to the case at bar was the proper disposition of the case in light of the court's decision. Because the defendant had not raised the issue of periodic payments until after the jury returned a verdict, the jury did not make a finding as to the amount of future damages it was awarding. *Due to the untimeliness of the defendant's request,* the plaintiff had not been able to ask for additional special verdicts to assist in this matter. Although the Supreme Court suggested a new trial might be appropriate in such a context, it did not order one in the case before it. The plaintiff had died in the interim and thus granting a new trial would not restore the status quo. Under the facts of the case, the court upheld the court's lump sum award in the interests of justice. (*Id.,* at p. 378; see also *Pressler* v. *Irvine Drugs, Inc., supra,* 169 Cal.App.3d at p. 1251, fn. 20.)

We believe the discussion in *American Bank & Trust Co.* and the dictim in *Pressler* is inapposite to the case at bar. We are not faced with a situation in which a party's untimeliness in requesting a special verdict worked to the detriment of the opposing party. In the case at bar, PMMG's failure to segregate economic from noneconomic losses was a mistake for which only it is responsible. As such, we do not believe retrial on the issue of damages is required. (See *Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 156 [211 Cal.Rptr. 368, 695 P.2d 665]; but see *Semsch* v. *Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162, 169-170 [216 Cal.Rptr. 913].)[15]

V. THE TRIAL COURT DID NOT ERR BY FAILING TO INSTRUCT THE JURY AS TO THE DEFINITION OF PROXIMATE CAUSE.

PMMG contends the trial court erred in allowing the jury to take BAJI No. 14.02[16] into the jury room since he never instructed them as to the concept of "proximate cause."

---

[14]This section provides in relevant part: "(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages."

[15]We recognize PMMG submitted uncontroverted *posttrial* juror declarations stating the jury awarded Moore $500,000 for pain and suffering. However, in light of its earlier actions, PMMG had already waived its rights under section 3333.2.

[16]This instruction provides, "The total amount of plaintiff's damages is the amount that

In discussing with counsel the jury instructions it would submit to the jury, the court stated it would instruct according to principles of legal rather than proximate cause. The court determined it would read the jury the definition of legal cause, BAJI No. 3.76, and BAJI No. 14.00,[17] not No. 14.02. The court read the jury BAJI No. 3.76 and BAJI No. 14.00, modifying the latter instruction by replacing the words "legally caused" for "proximately caused." However, when the jury was given written instructions to take into the jury room, they were given BAJI 14.02 which was not modified.

Although obviously it was error to give the jury this instruction in the form it was given, we do not believe the error was prejudicial. The court read the jury the definition for legal cause and read them 14.00 as modified, thus properly instructing the jury. While we recognize the jurors may not have remembered the court's oral recitation once they were in the jury room, they were given the definition of legal cause in written form and the special verdict which the jury returned used the language of "legal cause." Given this record, we believe it is a reasonable conclusion the jury properly determined Moore's damages based on a legal cause analysis.

VI. ALTHOUGH THE TRIAL COURT ERRED IN INSTRUCTING THE JURY AS TO MOORE'S LIFE EXPECTANCY, SUCH ERROR WAS NOT PREJUDICIAL.

██ In instructing the jury as to Moore's life expectancy, the court stated according to a table of mortality, the life expectancy of a male person aged 46 years is 30.5 additional years. Moore was 46 years old at the time of trial. However, this reading of the mortality table was in error. The life expectancy of all males aged 46 was 27.9 years and for all white males was 28.2 years. PMMG contends the jury's determination of damages for a lifelong injury such as Moore's pain and suffering may have been overstated due to this inaccurate information. We disagree.

When the court's instruction is read as a whole, it becomes purely speculative whether the jury based any of its damage awards on this improper

---

will reasonably compensate him for each of the following elements of claimed loss or harm, provided that you find that such loss or harm was [or will be] suffered by him and *was proximately caused* by the act or omission . . . of the defendant, if you so find. The total amount of damages shall include: [medical expenses, lost earning capacity, pain and suffering.]" (Italics added.)

[17]As the court instructed, "If, under the court's instructions, you find that the plaintiff is entitled to a verdict against the defendant, you must then award plaintiff damages in an amount that will reasonably compensate him for each of the following elements of claimed loss or harm, subject to being reduced as you will be instructed . . . provided that you find that such harm or loss was or will be suffered by him and legally caused by the act or omission upon which you base your finding of liability."

figure. As the court stated: "According to a table of mortality, the life expectancy of a male person aged 46 years is 30.5 additional years. *This is not conclusive.* It is an *average* life expectancy of persons who have reached that age. This figure *may be considered* by you in connection with other evidence relating to the probable life expectancy of plaintiff, including evidence of his occupation, health, habits and other activities, *bearing in mind that many persons live longer and many die sooner than the average.*" (Italics added.) Given the slight error in the number of years stated and the other factors which the jury could properly take into account in determining Moore's life expectancy, we do not believe the court's error in this regard was prejudicial.

VII. THE JUDGMENT AGAINST PMMG SHOULD BE MODIFIED TO ALLOW CREDIT FOR DR. MASON'S OUT-OF-COURT SETTLEMENT.

PMMG contends the judge erred in entering judgment for the full amount of damages for which the jury found PMMG responsible. The court should have reduced PMMG's liability by the amount of Dr. Mason's settlement. Moore concedes that this is the case. As such, Moore's award of $549,750 shall be reduced to reflect the earlier settlement.[18]

### DISPOSITION

The judgment is reduced by $18,000—the amount the jury awarded Moore for the future loss of earnings in the real estate field. PMMG is also given credit for the amount of Dr. Mason's settlement ($5,000). In all other respects, the judgment is affirmed. Respondent to recover costs.

Lillie, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied April 8, 1986, and the opinion was modified to read as printed above.

---

[18]Moore contends sanctions should be imposed against PMMG for bringing this appeal. We believe such an action would be totally inappropriate.