Filed 3/27/13  Church v. Marshalls of CA CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| SILVIA CHURCH, | D059335 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2008-00072757-CU-PO-SC) |
| MARSHALLS OF CA, LLC, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County, Ronald L. Styn, Judge.  Affirmed.


Defendant Marshalls of CA, LLC (Marshalls) appeals a judgment entered in favor of Silvia Church in this slip and fall case.  Marshalls asserts the trial court erred by (1) admitting into evidence photographs taken over three years after Church's accident and (2) instructing the jury with CACI No. 204 regarding the intentional concealment or destruction of evidence.  It also claims that the special verdict form was fatally defective because it did not allow the jury to resolve the issue of actual or

constructive notice of the alleged dangerous condition. We reject Marshalls's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On April 16, 2007, Church broke her right ankle and tibia after she fell on something "slippery" in the aisle of the Marshalls store located in Chula Vista. After she fell, Church looked around to determine what she had slipped on. She saw a long dress on her left side, a little bit behind her, that was draping on the floor. Blanca Rangel, the assistant manager for the women's department, heard someone fall, turned around and saw Church on the floor. She saw nothing on the floor other than Church and saw only that no clothing had fallen on top of Church. Rangel then returned a rolling rack to the stockroom, again looked on the floor near Church, but did not see anything on the floor. Rangel admitted, however, that someone could have removed the dress during the two or three minutes she was away from the scene.

Susana Rivera, the front-line supervisor on the day of the accident, learned about the fall and saw Church on the floor. Rivera saw a long dress draping on the floor near where Church had fallen. Rivera investigated the accident with Rangel and helped Rangel fill out an incident report shortly after the accident. Rivera wrote the sections in the report about what happened and what action was taken to correct the problem. Rivera claimed that the description of how the accident occurred was relayed to her by another person, but she could not remember the name of the person.

The incident report stated that Church had "[s]tepped on a dress hanging from [a] 4-way [rack]." Another portion of the report for actions taken to correct the

2

problem noted that an ambulance was called and "[r]emoved item." Rangel claimed that she did not know how the information that Church had stepped on a dress got into the incident report. She also did not know what item had been removed. Rivera, however, claimed that the portion of the incident report stating "[r]emoved item" referred to the dress hanging on a 4-way rack that Church had stepped on.

Rangel's job included "recovery," which meant ensuring that clothes were not on the floor and that the store was nice and presentable. Rangel testified that all employees were responsible for "recovery" and that, as an assistant manager, she was responsible for making sure that employees actually did recovery work. Rangel admitted there would be occasions where she would find items of clothing on the sales floor and stated she had been trained to pick up the items.

Brenda Nunez, the store manager on the day of the accident, claimed that the recovery of misplaced merchandise happened as often as necessary. She admitted that Marshalls had no written policy about doing hourly sweeps in the store to make sure that merchandise was in its proper location. If she saw a misplaced item in the store, she would put it back where it belonged and she expected other Marshalls employees to do the same thing. Nunez walked the sales floor frequently to make sure that this expectation was being met.

Brad Avrit, Church's expert witness regarding potential safety and liability issues, visited the store where the accident occurred on two occasions. He took a total of 67 photographs when he visited in August 2010. During that visit, he was in the store for about 35 or 40 minutes and claimed that about 150 items were on the floor

3

when he first arrived and were still on the floor when he left and that "employees walk[ed] right by these things on multiple occasions." This suggested to Avrit that the store was not being regularly cleaned or maintained.

Avrit testified that the industry standard for floor safety required a four-pronged approach of having a person assigned to clean, having the cleaning done on a regular basis, having management confirm this was done, and instructing other employees about the importance of keeping the aisles clear. Avrit concluded that Marshalls's maintenance policy fell below the standard of care.

A jury returned a verdict in favor of Church and awarded her $300,852 for her injuries. The trial court denied Marshalls's motion for judgment notwithstanding the verdict and entered a judgment in favor of Church. Marshalls timely appealed.

DISCUSSION

I. *Admissibility of Postaccident Photographs*

A. Facts

Marshalls made an oral in limine motion to preclude admission of the 67 photographs taken by Avrit under Evidence Code section 352. (Undesignated statutory references are to the Evidence Code.) Marshalls argued that the photographs were extremely prejudicial in terms of their content and the number of photographs. Plaintiff's counsel responded that the photographs were relevant to show that Marshalls did not have a policy regarding misplaced items, that this remained an ongoing problem at the store and revealed a "pattern of practice." The trial court concluded that the photographs were relevant to show that Marshalls failed to clean up

4

the store and that it could be pointed out to the jury that the photographs were taken years after the accident. Avrit later testified, without objection, regarding what was depicted in eight of the photographs.

B. Analysis

Marshalls asserts the trial court erred in allowing the jury to consider photographs, taken over three years after Church's accident, depicting conditions in the store as evidence of its custom and practice of maintaining a disorderly store. Marshalls contends that the photographs constituted inadmissible character evidence under section 1101, that it had a policy in place regarding cleaning the store and, in any event, Church failed to establish that she slipped on a long dress or any other item on the floor. Church responds that the photographs were admissible under section 1105 as evidence of Marshalls's habitual failure to clean merchandise from its floors and aisles, and under subdivision (b) of section 1101 as evidence of a custom and practice of Marshalls not having regular store inspections or regular store sweeps. She also contends that the photographs impeached the testimony of Marshalls's witnesses that they had a system to keep the store clean despite the lack of a written policy.

As a threshold matter, Marshalls waived its contention that the photographs constituted improper character evidence by failing to object to the photographs on this ground at trial. (§ 353, subd. (a).)

Accordingly, we review whether the trial court erred in admitting the photographs under the abuse of discretion standard. (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 885.) A trial court abuses its discretion if it

5

exceeds the bounds of reason (*ibid.*); however, even where evidence has been erroneously excluded, the judgment or decision shall not be reversed unless the reviewing court believes the error resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; §§ 353, 354.) "'"[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."'" (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069.)

The term "habit" refers to a person's regular response to a repeated specific situation, while the term "custom" refers to the routine practice of a group or organization that is equivalent to the habit of an individual. (*People v. Memro* (1985) 38 Cal.3d 658, 681, fn. 22 (*Memro*).) Evidence of habit or custom is admissible to prove conduct on a specific occasion in conformity with the habit or custom. (§ 1105.) "'Habit' or 'custom' is often established by evidence of repeated instances of similar conduct." (*Memro*, *supra*, at p. 681, fn. omitted.)

Here, there was no evidence presented that Marshalls had a custom of leaving items on the floor. First, there was no evidence presented that on the date of the accident there were a lot of items on the floor or that the store was otherwise messy or not picked up. Similarly, although Marshalls's employees testified that customers frequently misplaced items and some items might end up on the floor, Church presented no evidence that Marshalls had a custom of *leaving* such items on the floor. Avrit provided the only evidence that items were left on the floor during a visit three

6

years after the accident. This single occurrence is insufficient to establish a custom of leaving items on the floor.

In any event, the photographs were arguably admissible for a proper purpose, i.e., to show that Marshalls's policy of doing recovery on an as-needed basis was not followed. However, we need not decide this issue because even if the trial court erred in admitting the photographs, Marshalls did not object to Avrit's testimony that he observed items on the floor when he arrived at the store that remained on the floor when he left. These observations provided the basis of Avrit's opinion that the store was not being regularly cleaned or maintained. Accordingly, any error was harmless as the photographs were merely illustrative of Avrit's observations and opinions, to which Marshalls did not object.

## II. *Instruction Regarding Destruction of Evidence*

A. Facts

Nunez believed that Church tripped on untied strings hanging from blouses that Church had been carrying. Nunez took photographs of the blouses, the floor and the 4-way rack and placed them under the keyboard on her desk. It did not occur to her to place the photographs with the incident report. The photographs, however, were eventually lost. Additionally, Avrit testified that Marshalls had a policy for store management to investigate the cause of any accident.

On the date of the accident, there were 13 loss prevention cameras in operation in the store. Nunez never went to the video room to see how the accident happened. About a month or two after the incident, Nunez was asked to see if there was any

7

video footage of the accident. Nunez contacted Jeff Turner, the loss prevention district manager, told him about the accident and suggested that he look for a crowd of people and the paramedics entering the building. Turner sent a detective to the store and Nunez later found a DVD on her desk. Nunez gave the DVD to a Marshalls attorney without looking at it. Nunez did not contact anyone from loss prevention to preserve the video footage. Additionally, Nunez never discussed with Turner what was and what was not captured on the video cameras, nor did she check with Turner or anyone else about whether there was video footage available showing Church's accident. Avrit testified that Marshalls did not follow industry standard regarding retaining video footage and that such footage might exonerate a store if it shows a porter going by every 30 minutes to clean.

Church later requested that the jury be instructed with CACI No. 204 regarding the willful suppression of evidence based on the photographs. This instruction provides that a jury "may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party." The trial court agreed that the evidence supported the instruction. During closing argument, plaintiff's counsel asserted that the lost or destroyed video footage also supported giving the instruction.

B. Analysis

"'[A] party is entitled to have the jury instructed on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may properly be drawn from the evidence.'" (*Moore v. Preventive Medicine Medical*

*Group, Inc.* (1986) 178 Cal.App.3d 728, 744.) While it is error to instruct the jury on the willful suppression of evidence where no evidence supports the instruction, the instruction does not require direct evidence of fraud. (*Bihun v. AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976, 992 (*Bihun*).) For example, the *Bihun* court found the willful suppression of evidence instruction proper where defendant employer was unable to produce a supervisor's personnel records in a sexual harassment case and concealed the fact that the records had been lost or destroyed until forced to reveal the truth in the middle of trial. (*Bihun*, *supra* at pp. 985, 991, 993–994.) The court noted that under the circumstances, defendant reasonably should have anticipated that the files would be requested if it was sued, and that the instruction was further supported by the fact that plaintiff's personnel file could be found while her supervisor's file could not. (*Id.* at pp. 993–994.)

Marshalls asserts the trial court erred in instructing the jury with CACI No. 204 because no substantial evidence supported the instruction. We disagree.

The evidence established that a store manager such as Nunez was required to investigate accidents. Rivera saw a long dress draping on the floor a couple of inches near where Church had fallen. Nunez took photographs of the accident scene, but did not place the photographs with the incident report and lost them. The jury could reasonably conclude that the photographs depicted what Rivera had observed, namely a dress draping on the floor. Significantly, it was for the jury to decide the credibility of the witnesses, including Nunez's testimony regarding the photographs. (CACI No. 5003.) Although Nunez testified that she placed the photographs under the keyboard

9

on her desk and that the photographs were inexplicably lost, the jury could have rejected this explanation and concluded that Nunez, anticipating that the accident might result in litigation, threw the photographs away because they were unfavorable to Marshalls.

Because loss of the photographs was sufficient to warrant the instruction, we need not address the video footage; however, we do so because the parties spent a considerable amount of time on this issue.

Marshalls claims that the video cameras did not capture the accident and Church presented no evidence that a camera actually captured the fall. This argument misses the point. Had the video footage of all the cameras in the store been preserved, it would have been possible to determine whether a camera actually captured the fall. Marshalls, however, did not preserve the video footage and it is impossible to determine what the video footage might have shown. Notably, although Nunez was required to investigate accidents, she never went to the video room to see how the accident happened. When Nunez contacted Turner, she suggested that he look for a crowd of people and the paramedics entering the building.

Thereafter, Turner had a detective make a DVD of the video footage. The DVD showed views of the store taken from four different cameras. The DVD, which was shown to the jury, shows paramedics going to a location that is just off camera. Critically, Nunez never told Turner to look for video footage of the fall and there is no evidence that Turner instructed the detective to look for such footage as Nunez admitted that she never discussed with Turner whether there was video footage

10

available showing Church's accident.  Thus, the lost video footage also supported the instruction.

### III. *Verdict Form*

A.  Facts

Marshalls submitted a proposed special verdict form which asked the jurors to decide whether Church encountered a dangerous condition, and if so, whether Marshalls had actual notice of the alleged unsafe condition in sufficient time to discover it and repair it, protect against harm from it, or adequately warn of it.  If the jury answered the latter question affirmatively, the proposed special verdict form also asked the jury to decide whether the condition existed long enough for Marshalls to discover, repair or warn of it, and whether "Marshalls's failure to discover the condition and either repair it, protect against harm from it, or adequately warn of it [was] a substantial factor in causing harm to . . . Church."

The trial court refused to give Marshalls's proposed special verdict form, electing instead to use Church's form because "the one submitted by the Plaintiff[] is in the CACI form.  The other special verdict form is different, [it] is a custom form, and I'm supposed to use CACI."  The trial court explained that the jury instructions covered the notice issue and that the issue was subsumed in the ultimate question regarding whether Marshalls was negligent.  The trial court confirmed that counsel could address the "notice issue" during closing argument, and defense counsel did so in detail.  The verdict form given to the jury asked it to decide whether Marshalls was

11

"negligent in the management or use of the property," and if so, whether this negligence caused any harm.

B.  Analysis

Marshalls claims the special verdict form was fatally defective because it did not allow the jury to resolve the issue of actual or constructive notice.  We reject this assertion.

As a preliminary matter, Marshalls did not challenge the sufficiency of the evidence showing it had actual or constructive notice of the dangerous condition and we reject its conclusion that no evidence established that a dress was draped on the floor or that it lacked actual or constructive notice of the alleged dangerous condition. Marshalls also does not challenge the adequacy of the instructions given to the jury regarding notice.

We review the trial court's refusal to use Marshalls's proposed special verdict form for an abuse of discretion.  (*Gorman v. Leftwich* (1990) 218 Cal.App.3d 141, 150 [abuse of discretion to refuse request for special verdict in medical malpractice action on issue of future damages].)  We conclude the trial court did not abuse its discretion in rejecting Marshalls's proposed special verdict form because the jury was properly instructed on the issue of notice with CACI Nos. 1001 (basic duty of care), 1003 (unsafe conditions) and 1011 (constructive notice).  Additionally, during closing argument, defense counsel thoroughly reviewed the requirement that Marshalls have actual or constructive notice of the alleged dangerous condition as a prerequisite to a negligence finding.  On this record,

12

we conclude the trial court did not abuse its discretion in rejecting Marshalls's proposed special verdict form.

## DISPOSITION

The judgment is affirmed. Respondent is to recover her costs on appeal.

MCINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

MCDONALD, J.

13