Filed 10/16/25  Hughes v. Libeu CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KIMBERLY HUGHES,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>NATHAN LEON LIBEU et al.,<br><br>　　　Defendants and Respondents. | A168172<br><br>(Sonoma County<br>Super. Ct. No. SCV-261621)<br><br>**ORDER MODIFYING OPINION; AND DENYING PETITION FOR REHEARING**<br>　**[NO CHANGE IN JUDGMENT]** |

**THE COURT***:

It is ordered that the opinion filed herein on September 30, 2025, be modified in the following particulars:

On page 35, lines 8-9, the following sentence is deleted:  "Apparently, prospective jurors were not asked if they had ever driven through the intersection or had any preconceived opinion about what was a reasonable speed to drive through it."

The deleted sentence on page 35, lines 8-9 is replaced with the following sentence:  "Apparently, prospective jurors were not asked if, from

---

* Tucher, P. J., Fujisaki, J., and Rodríguez, J. participated in the decision.

their own experience driving through the intersection, they had any preconceived opinion about what was a reasonable speed to drive through it."

This modification does not effect a change in the judgment.

Appellant's petition for rehearing is denied.

Dated:___October 16, 2025_____          ___TUCHER, P. J._____
                                             PRESIDING JUSTICE

*Hughes v. Libeu et al.* (A168172)

2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KIMBERLY HUGHES,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>NATHAN LEON LIBEU et al.,<br><br>     Defendants and Respondents. | A168172<br><br>(Sonoma County<br>Super. Ct. No. SCV-261621) |

Kimberly Hughes filed this negligence action to recover damages arising from a 2016 accident when she was hit by a truck while riding her bicycle.  Nathan Libeu was driving the truck, which was owned by his employer, Herc Rentals Inc. (Herc).  In 2023, a jury determined Libeu was not negligent in causing Hughes harm, and the court entered judgment in favor of Libeu and Herc.  The court also denied motions for judgment notwithstanding the verdict and for a new trial.  We affirm.

**BACKGROUND**

The accident occurred on May 28, 2016, at around 6:20 a.m., at the intersection of Mendocino Avenue and 10th Street in Santa Rosa.  Hughes filed her complaint against Libeu in December 2017 and subsequently added Herc as a defendant.  Pretrial litigation was extensive.

Trial was conducted in two phases.  In May 2022, a court trial was held to decide two issues not challenged on appeal.  The court found (1) at the time

1

of the collision Libeu was borrowing, rather than renting, the truck from his employer, and (2) a waiver and release entered into by Hughes, Herc, and Herc's insurance company was not enforceable.

In early 2023, a jury trial was held to resolve Hughes's claim that defendants were liable for her damages due to Libeu's negligence. The jury heard evidence about the accident from four percipient witnesses and two accident reconstruction experts. Multiple witnesses also testified about Hughes's injuries.

### *The Accident*

Santa Rosa Police Officer Timothy Gillette, who was dispatched to the 2016 accident, did not testify at trial, but excerpts from his deposition were read into the record. According to that testimony, when Gillette arrived at the scene, Libeu's truck was in the "No. 1" (i.e., leftmost) lane of two northbound lanes on Mendocino, and emergency responders were tending to Hughes. Gillette took a statement from Libeu, who reported that he was driving north on Mendocino when he saw Hughes riding her bike along the far right side of the road, and as he approached the intersection, Hughes "quickly veered left in front of him, and he tried to stop, but he couldn't stop and ultimately collided with her."

During Gillette's deposition, he was asked what he recalled about Libeu's demeanor at the scene. Gillette testified that Libeu was concerned about the fact that he had hit someone. He told Gillette that he had borrowed his employer's truck to pick up supplies for his girlfriend's birthday party and had been thinking about the party while he was driving. He thought he had a green light as he approached the intersection, but he seemed unsure. Gillette also testified about video that had been recorded by a surveillance camera in a store window, which partially captured the

2

accident. Based on what he saw depicted in the video, Gillette concluded that Hughes "made the left turn without even looking to see if anybody was coming," and that she made the sudden sharp turn directly in front of the truck so that there "was no way that [the] truck could have stopped in time."

Several witnesses besides Gillette were asked about the video of the accident, which was admitted into evidence and played for the jury. The video shows Hughes as she approached the intersection on her bike. Before Hughes reached the crosswalk, she started making a rounded left turn into the crosswalk, and she was cycling parallel with and on or near the outside line of the crosswalk when the truck traveling in the number one northbound lane collided with her. The video does not show the color of either traffic light at the time of the collision.

At trial, Hughes testified that she had been riding a bicycle in the area where the accident occurred since she was a child, she knew the rules of the road, and it was her habit to use "hand signals." Hughes had no memory of the accident, but she attested that she knew certain facts based on her review of the video. Specifically, Hughes testified that when the accident occurred, she was in the crosswalk, and that she was not turning left onto 10th Street but was instead on her way to a church on Mendocino. Hughes testified that she was not wearing a helmet because "I don't see why I need to." By the time of trial, Hughes had resumed riding her bike, and she continued to "never wear a helmet." Under cross-examination, Hughes was asked to demonstrate a left-hand signal. She attempted to avoid the question but ultimately acknowledged that she could not demonstrate the signal. Hughes testified that she was "entering a crosswalk," which is "different than changing lanes and making a left turn."

3

Libeu testified that prior to the 2016 accident, he was very familiar with the intersection at Mendocino Avenue and 10th Street. He knew that 10th Street is a one-way street, with vehicles traveling only in an eastbound direction; that a vehicle traveling north on Mendocino could not make a left turn onto 10th Street; and that a sign posted at the intersection indicates U-turns and left turns are not allowed. Regarding the day of the accident, Libeu testified that he was traveling in the number one northbound lane on Mendocino when he noticed Hughes on her bike travelling on the far right side of the number two northbound lane. There were no other vehicles on the road that morning, and Libeu recalled that he was driving between 25 and 30 miles per hour, a speed he felt the conditions warranted. He was not in a hurry, not on his phone, and had not been drinking. Libeu testified further that, as he approached the intersection, he noticed his light was green and there were no pedestrians waiting at the crosswalk. He was paying attention as he was driving, he saw Hughes as he approached the intersection, and he did not see her make any signal to indicate she intended to change lanes before she made a sudden left turn directly in front of him. Libeu immediately hit his brakes and came to a stop as fast as he could, he testified.

Robert Moreno testified that on the morning of the accident, he was sitting on a cement wall waiting to have breakfast at the Unitarian Church when he saw many homeless people coming from various directions to attend the breakfast, including Hughes. Moreno testified that he saw Hughes stop at the crosswalk and wait for her light to turn green so she could cross. According to Moreno, Hughes waited at least a "few seconds," and when her light turned green, she got up on her seat and began pedaling across the street. Then, in his "peripheral vision," Moreno saw a white work truck

4

traveling north on Mendocino that ran a red light and hit Hughes as she was crossing the street. At trial, Moreno did not have "one bit" of doubt that the truck ran a red light.

### Accident Reconstruction Experts

John Smith was the plaintiff's accident reconstruction expert. Smith calculated that Libeu was driving at a speed of 39 miles per hour as he approached the intersection, and his speed at the time of impact was 34 miles per hour. Smith offered the opinion that the accident would not have occurred if Libeu had been driving the speed limit, which was 25 miles per hour. Under that scenario, Smith opined, Hughes would have been able to cross the street safely without being hit. Smith also believed the collision would not have occurred, or would have been far less impactful, if Libeu had kept his vehicle straight when he reached the intersection; it was Smith's opinion that Libeu turned left into Hughes, causing greater damage.

Eric Rossetter testified as the defendants' accident reconstruction expert. In Rossetter's opinion, Libeu was traveling between 33 and 35 miles per hour as he approached the intersection and at the time of impact. Rossetter also determined that Hughes was traveling around 10 miles per hour and had slowed to about 8 miles per hour as she impacted with the truck "through the left turn." In Rossetter's opinion, Libeu "reacted very rapidly to the left-turning bicycle." The video of the incident was a "key piece" of the information Rossetter used to analyze the collision. During his testimony, Rossetter reviewed individual frames that had been pulled from the video and explained how they supported his opinions.

### Hughes's Injuries

Hughes called expert witnesses to testify about her injuries. Dr. Feder, an expert in orthopedics and orthopedic surgery, did not examine Hughes,

but he reviewed her medical records and spoke with her on the phone. Hospital records showed that when Hughes was admitted after the accident, she tested positive for amphetamine but not methamphetamine, and that she was intubated due to her injuries. Feder opined that several of Hughes's injuries were potentially life-threatening, including a skull fracture, subdural hematoma, spleen injury, and rib fractures. Hughes also had a severe tibia and fibular fracture. Feder testified that, although the orthopedic surgeon who treated Hughes did an "excellent job" her leg injury would cause chronic problems.

Dr. McCoy, defendants' orthopedic expert, examined Hughes in May 2021. When Hughes appeared for her exam, she displayed no residual limp, and she reported that the only thing that continued to trouble her was swelling and discomfort in her left leg. McCoy also reviewed Hughes's medical records, which documented two prior accidents: a 2014 solo bicycle accident and a 2015 "motor vehicle versus bicycle accident." Based on his review of records pertaining to the 2016 accident, McCoy opined that Hughes was combative while being treated for her injuries and noncompliant with her postsurgery treatment plan.

Hughes presented evidence regarding her head injury through the testimony of Dr. Mobin, her designated expert in neurological surgery. In September 2021, Mobin conducted a neurosurgical evaluation of Hughes, based on his review of her medical records and an audio call with her. Mobin testified that Hughes sustained a complex cranial fracture and contusions to the left side of her brain, which could result in cognitive decline.

The defense did not call a neurology expert witness but presented deposition testimony from the radiologist who treated Hughes after the accident, Dr. Popovich. Popovich testified that Hughes's CT scan showed a

6

skull fracture, but the brain itself appeared relatively normal, aside from a small "finding" that he made, which was likely incidental and not caused by the collision.

The defense also elicited testimony from Dr. Benowitz, an expert in toxicology and pharmacology. Benowitz, who had reviewed medical records pertaining to Hughes's use of methamphetamine, offered the opinion that the expected behaviors of a long-term methamphetamine user include impulsivity, impatience, poor decision-making, and problems with memory.

***Jury Verdict and Judgment***

On March 1, 2023, the case was submitted to the jury with directions to return a verdict on special verdict issues. The jury quickly reached a verdict by answering the first question on the special verdict form, finding that Libeu was not negligent. Judgment on the special verdict was entered, and Hughes filed motions for judgment notwithstanding the verdict and for a new trial. Both motions were heard on June 2, 2023 and soon denied in a detailed written order. Hughes then timely filed this appeal.

## DISCUSSION

## I. Denial of Judgment Notwithstanding the Verdict

"A trial court must render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have been granted. (Code Civ. Proc., § 629.) A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68.) Our standard of review is the same as the standard applied by the trial court, "whether any substantial

7

evidence—contradicted or uncontradicted—supports the jury's conclusion." (*Ibid.*)

Hughes contends she is entitled to judgment notwithstanding the verdict because "there was more than overwhelming evidence" that Libeu "was at least 1% or more negligent." Notably, though, the statement of facts in Hughes's appellate brief does not contain a summary of the trial evidence. Instead, in arguing that she is entitled to judgment in her favor, Hughes relies on isolated snippets of trial testimony. Under these circumstances, Hughes has forfeited her claim that the judgment is not supported by the evidence. "When an appellant's opening brief states only the favorable facts, ignoring evidence favorable to respondent, the appellate court may treat the substantial evidence issues as waived and presume the record contains evidence to sustain every finding of fact." (*Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173–1174; see *Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.) The reason for this rule is illustrated well by Hughes's appellate briefing; the appellant cannot carry her burden to show the evidence is insufficient to support the jury's finding when support for that finding may lie in the evidence she ignores. (*Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1072.)

Regardless, Hughes's claim that she proved Libeu's negligence as a matter of law fails on its merits. Hughes takes the position that a finding Libeu failed to exercise reasonable care was compelled by evidence that he told Officer Gillette he had been thinking about his girlfriend's party and gave the officer the impression he was second-guessing himself. We reject this flawed theory.

The "reasonable care required by negligence law depends on all the circumstances." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 777.) Because this standard is "inherently situational, the amount of care deemed reasonable in any particular case will vary, while at the same time the standard of conduct itself remains constant, i.e., due care commensurate with the risk posed by the conduct taking into consideration all relevant circumstances." (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 997; see *Mayes v. La Sierra University* (2022) 73 Cal.App.5th 686, 705, fn. 2 [whether defendant acted reasonably under the circumstances presents questions of fact for the jury to decide].) Assuming that Libeu was thinking about the party while he was driving, that was not the only relevant circumstance. As our background summary reflects, there was evidence that Libeu was also paying attention to Hughes that morning, that his speed was reasonable for the conditions, and that he responded rapidly when Hughes made a sudden illegal left turn in front of him, a turn that made it impossible for him to stop in time to avoid the collision.

The record shows the jury was also instructed regarding principles of negligence per se, as both parties alleged that the other had violated the Vehicle Code. The doctrine of negligence per se can be used to establish a rebuttable presumption of negligence arising out of a violation of a statute, ordinance, or regulation. (*Johnson v. Honeywell Internat. Inc.* (2009) 179 Cal.App.4th 549, 555.) It does not create an independent cause of action for violating a statute (*id.* at p. 556), nor does it lead "automatically to negligence liability." (*California Service Station etc. Assn, v. Am. Home Assurance Co.* (1998) 62 Cal.App.4th 1166, 1171, fn. 5.) In this case, Hughes alleged that Libeu violated Vehicle Code section 21453, which requires a driver to stop at a red light and, if there is no light, to stop before entering a crosswalk.

9

On appeal, Hughes argues Libeu was negligent as a matter of law based on Moreno's testimony that Libeu ran a red light and hit Hughes while she was in the crosswalk. But Hughes ignores relevant evidence from which the jury could have concluded that Moreno was not a credible witness. For one thing, Moreno's testimony about Hughes's actions was not consistent with the video evidence.[1] Moreover, Libeu testified that the light was green for his direction of travel. Thus, the record does not compel a finding that Libeu ran a red light.

Finally, Hughes argues that Libeu's negligence was established by the testimony of her accident reconstruction expert, John Smith, who opined Libeu was driving more than ten miles over the speed limit as he approached the intersection. To begin with, Smith acknowledged to the jury that he was not offering an opinion as to whether anybody was negligent in this case. Moreover, Smith's opinions were disputed by the defendants. And, as the jury was instructed, the jury was not required to accept opinions offered by the experts. (See e.g. *Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509.)

## II.  Denial of Motion for a New Trial

"We generally review a trial court's denial of a new trial motion for abuse of discretion, independently reviewing whether any error was prejudicial." (*Smith v. Magic Mountain LLC* (2024) 106 Cal.App.5th 1128, 1135.) We "review [each] determination underlying the denial of a new trial motion ' "under the test appropriate to such determination." ' " (*Ibid.*) On appeal, Hughes repeats every claim she made in her new trial motion. We

---

[1]  In addition, Moreno acknowledged at trial that he had previously been convicted of a felony. He was also less than forthcoming about his prior connections to Hughes and whether they were friends. Hughes testified that Moreno was not her friend, but she acknowledged that he was her best friend's stepfather.

review these issues in the order they arose at trial, except that challenges to the admission or exclusion of evidence relevant only to damages we reserve for last.

### A. Jury Voir Dire

Hughes contends she was denied a fair trial because the trial court precluded her counsel from asking potential jurors about critical issues in the case. We review trial court restrictions on voir dire questioning for abuse of discretion. (*Alcazar v. Los Angeles Unified School Dist.* (2018) 29 Cal.App.5th 86, 94.)

### 1. Additional Background

Voir dire was conducted over multiple days in February 2023. After the court heard hardship requests, the selection process began with the court asking prospective jurors about their backgrounds. Then counsel for each party presented a mini-opening statement. The court asked detailed follow-up questions about facts counsel had disclosed, ending this line of questions with explicit inquiries as to whether any juror had feelings that would bias them against either party or prevent them from being impartial. Then counsel for each party conducted their own examination of prospective jurors. The process was lengthy and thorough.

However, the court precluded Hughes's counsel from questioning prospective jurors about two discrete issues—their experiences with the criminal justice system and with drug addiction. These issues arose early in the jury selection process, when plaintiff's counsel made an oral motion to exclude evidence of Hughes's prior felony convictions. Counsel argued that if the convictions were not excluded, they were a proper subject for jury voir dire. Counsel was unable to provide details about Hughes's prior convictions, and issues of admissibility were left for another day. But the court ruled that

11

there would be no voir dire about impeachment evidence pertaining to Hughes's prior felonies.

Plaintiff's counsel raised the issue again the next day, and made an additional request to voir dire about "drug use." The court found both questions were improper because they were designed to elicit the jury's advance reaction to actual evidence that Hughes had felony convictions and a history of drug use. The purpose of voir dire, the court stated, is to look for general biases, "not bias based on a preview of [the] evidence." As support for its ruling, the court cited *People v. Mason* (1991) 52 Cal.3d 909 (*Mason*).

Hughes filed a motion for reconsideration, which sought leave to question prospective jurors about both issues: (1) whether they or their family members had been exposed to illicit drug addiction/use, and (2) whether they or their family members had been convicted of a crime or had "brushes" with the law. If a juror answered affirmatively, he or she was further to disclose "what attitudes or biases [the juror had] about the subject." Citing *People v. Williams* (1981) 29 Cal.3d 392 (*Williams*) (superseded in part by initiative statute; see *People v. Fuiava* (2012) 53 Cal.4th 622, 654), Hughes argued she had a right to explore these issues to uncover potential bias. The court ruled again that plaintiff could not voir dire prospective jurors with regard to the "potential evidence." The court found that permitting questioning on those issues before a jury was sworn posed a risk of preconditioning the jury and predetermining how jurors would respond to anticipated evidence.

When Hughes raised the issue again in her new trial motion, the court reiterated its prior rulings. It added that the two questions that Hughes proposed in her motion for reconsideration were so open-ended that they were

12

likely to invite a response that would disclose how a juror would evaluate such evidence, threatening to taint the entire jury panel.

### 2. Analysis

Hughes contends the trial court committed reversible error by violating Rules of Court that required the court to permit trial counsel to conduct a liberal and probing examination of potential jurors calculated to discover bias. Hughes does not identify a specific court rule, nor does she address Code of Civil Procedure section 222.5 (section 222.5), which governs jury voir dire in civil cases.

Section 222.5 provides that after the court completes an initial examination of prospective jurors, counsel for each party shall have the right to ask questions "in order to enable counsel to intelligently exercise both peremptory challenges and challenges for cause." (§ 222.5, subd (b)(1).) Counsel may conduct a "liberal and probing examination calculated to discover bias or prejudice with regard to the circumstances of the particular case." (*Ibid*.) However, the trial judge, in its sound discretion, may impose reasonable limits on the scope of the examination conducted by counsel. (*Ibid*.) Moreover, section 222.5 provides that an " 'improper question' " for voir dire "is any question that, as its dominant purpose, attempts to precondition the prospective jurors to a particular result, indoctrinate the jury, or question the prospective jurors concerning the pleadings or the applicable law.' " (§ 222.5, subd (b)(3).)

Hughes fails to establish any abuse of discretion under this standard. The trial court did not preclude plaintiff's counsel from liberally examining potential jurors; the record shows that counsel conducted detailed examinations. The two questions counsel was prevented from asking forecasted evidence that might have negatively impacted plaintiff's case:

13

Hughes and Morales had prior felony convictions, which were relevant to evaluate their credibility as trial witnesses; and Hughes had a history of methamphetamine abuse that was relevant to rebut her claim that the accident had caused her cognitive damage. The trial court was understandably concerned that counsel's proposed questions were so open-ended that they might invite commentary that would prejudge the evidence and potentially taint the jury panel. These questions could be properly excluded, just as the trial court in *Mason*, *supra*, 52 Cal.3d 909 appropriately prevented counsel from asking prospective jurors "whether, if they believed that a witness was an informant and was testifying 'in exchange for some lesser sentence,' then that 'would have some bearing on the weight or credibility that that witness may have in your mind?'" (*Id.* at p. 940.)

Hughes contends that the trial court's concerns were meritless because, as her counsel told the court, he did not intend to ask potential jurors "how they would vote if [Hughes] was involved in or using illicit drugs or had a criminal background." But omitting Hughes's name from the inquiry would not have changed the fact that these issues pertained directly to evidence that would be presented at trial. And the form of the questions—their very open-endedness—was itself a source of potential mischief.

Hughes posits that preventing her from exposing potential juror bias constituted a "gross violation" of her constitutional rights. We summarily reject this argument because it is not supported by legal analysis or citation to relevant authority.

Indeed, the *only* authority Hughes relies on to support her argument that she was entitled to ask these questions is *Williams*, *supra*, 29 Cal.3d 392, which does not support her claim. The aspect of *Williams* on which Hughes relies was specific to criminal cases and has since been abrogated by

the passage of Proposition 115. (See *People v. Fuiava*, *supra*, 53 Cal.4th at p. 654.) It held that counsel "should be allowed to ask questions reasonably designed to assist in the intelligent exercise of peremptory challenges whether or not such questions are also likely to uncover grounds sufficient to sustain a challenge for cause." (*Williams*, at p. 407.) In so holding, the *Williams* Court expressly left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Id*. at p. 408.) And the only voir dire question that the *Williams* Court found had been erroneously and prejudicially excluded was one that bore no similarity to the questions at issue here; it probed panel members' attitudes toward a "controversial" legal doctrine they would be asked to apply, "that a person may use force in self-defense even though an avenue of retreat is open." (*Id*. at pp. 410–411.)

Without authority on point, Hughes has failed to carry her burden of establishing that the trial court abused its discretion in excluding voir dire questioning on these topics.

## B. Admission of Hughes's Prior Convictions

After raising the issue during voir dire, Hughes filed a written motion to exclude all references to her prior criminal convictions. She argued that her convictions were remote in time, irrelevant, and unduly prejudicial, and should be excluded pursuant to Evidence Code section 352, even for impeachment. In her motion, Hughes listed six prior cases involving felony convictions, arguing that each should be deemed inadmissible.

At the hearing on this motion, the court ruled that four of Hughes's felony convictions involved crimes of moral turpitude and were admissible for purposes of impeachment: a 2011 conviction for violating Penal Code section 529 [false impersonation]; two convictions in 2005 for violating Penal Code section 496, subdivision (a) [receiving or concealing stolen property]; and a

15

2004 conviction for violating Penal Code section 459 [burglary].  The court also ruled that evidence pertaining to the convictions was to be sanitized so that facts and circumstances of the prior crimes were not disclosed to the jury.  On appeal, Hughes contends that the admission of her prior felony convictions constitutes reversible error.  We disagree.

"Evidence that a witness has been convicted of a felony is admissible to attack the witness's credibility.  [Citation.]  Such evidence is a general attack on a witness's character for honesty." (*Piscitelli v. Salesian Society* (2008) 166 Cal.App.4th 1, 6–7, fn. omitted (*Piscitelli*); Evid. Code, § 788.)  Though a prior felony is generally admissible for purposes of impeachment, it remains subject to exclusion under Evidence Code section 352, if its probative value is substantially outweighed by its prejudicial effect.  (*Piscitelli*, at p. 7.)

Hughes posits that admitting her prior felonies was *per se* prejudicial error because they did not bear on her veracity or truthfulness, and they were too remote.  The law is otherwise.  Although "[m]oral turpitude is a concept that 'defies exact description' [citation] and 'cannot be defined with precision' " (*In re Grant* (2014) 58 Cal.4th 469, 475–476), courts have long found that burglary is a crime of moral turpitude.  (*People v. Collins* (1986) 42 Cal.3d 378, 395.)  A felony conviction for receiving stolen property involves "conduct consistently held to be probative of a witness's veracity.  (*Holley v. J & S Sweeping Co.* (1983) 143 Cal.App.3d 588, 594 (*Holley*).)  And crimes involving fraud or intent to defraud also fall within this definition.  (*Carey v. Board of Medical Examiners* (1977) 66 Cal.App.3d 538, 541.)

Furthermore, although remoteness is a relevant factor, it is not dispositive.  (*Holley*, *supra*, 143 Cal.App.3d at pp. 594–595.)  Contrary to Hughes's appellate argument, the record affirmatively shows that the court did consider whether the prior convictions were remote but concluded

16

ultimately that four of them were admissible.  Hughes fails to show the ruling was an abuse of discretion.

## C.  Admission of Dr. Benowitz's Testimony

Hughes contends the trial court committed multiple errors by permitting the defendants' toxicology expert to testify at trial.  "We review the court's admission of expert testimony for clear abuse of discretion, looking to whether the court's ruling 'exceeded the bounds of reason.'  [Citations.]  'As a general rule, the opinion of an expert is admissible when it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." ' "  (*Piscitelli*, *supra*, 87 Cal.App.4th at p. 972.)

### 1.  Additional Background

Prior to trial, Hughes filed a motion to exclude Dr. Benowitz's testimony, which defendants opposed.  At the hearing on this motion, plaintiff's counsel clarified that his objection was limited to testimony regarding Hughes's habitual drug use, and whether it affected her behavior or contributed to her traumatic brain injury (TBI).  The court ruled that Benowitz could not offer an opinion as to whether Hughes was under the influence on the day of the accident, as there was no evidence of that.  However, plaintiff's counsel conceded that Hughes had put her postaccident cognitive condition at issue, and because past drug use could be relevant to that disputed issue, the court held a hearing pursuant to Evidence Code section 402 (section 402), to elucidate Benowitz's opinions.

The section 402 hearing, held during a break from jury selection, was long and contentious.  After the matter was submitted, the court asked Benowitz to clarify the two opinions that had been asked of him by the defense.  Benowitz testified that his first opinion was that Hughes was a

17

chronic methamphetamine user and there was a high probability that she used methamphetamine within a few days of the accident. His second opinion was that chronic methamphetamine use causes changes to the brain structure and function that are associated with impulsivity and lack of judgment, and these behaviors would be consistent with making a sudden left turn into traffic. The court found both opinions were admissible as there was a sufficient nexus between them and the factual events.

However, at the next court hearing, the court modified its ruling as to the admissibility of Benowitz's opinion that Hughes may have taken methamphetamine near the time of the accident. After conducting its own research on the issue, the court advised the parties that it was considering excluding this opinion as "too speculative," citing *David v. Hernandez* (2017) 13 Cal.App.5th 692 (*Hernandez*). As best we can tell, Hughes did not pursue this specific issue further, although she made several more unsuccessful attempts to preclude Benowitz from testifying at all.

When Benowitz testified at trial, defendants' counsel did not ask him any questions about Hughes's conduct on the day of the accident or whether she was under the influence of methamphetamine. However, defense counsel did ask Benowitz about Hughes's medical records, which elicited testimony that several records mentioned Hughes was a chronic methamphetamine user. That testimony was stricken from the record pursuant to *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). Subsequently, Benowitz testified that he formed opinions about whether Hughes was a long-term user of methamphetamine, but he did not share those opinions with the jury during his direct examination. Instead, Benowitz was asked about a hypothetical scenario involving a chronic methamphetamine user and, in that context, he offered opinions about the likely effects of such long-term drug use.

18

Under cross-examination, plaintiff's counsel asked Benowitz several questions about Hughes's use of methamphetamine. For example, Hughes's trial counsel asked whether Benowitz believed that, because Hughes had used methamphetamine over a long period, "perhaps" there could have been some effect on her brain. Benowitz answered yes to that question, and he also confirmed his belief that because of Hughes's drug use, she may have had some "impulsivity or impatience in or around the time of the accident."

### 2. Analysis

On appeal, Hughes contends that permitting Benowitz to testify at trial was reversible error because his opinions violated the holdings of *Sanchez*, *supra*, 63 Cal.4th 665, and *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747 (*Sargon*).

As a preliminary matter, we must correct Hughes's mischaracterization of the record regarding opinions that the court found were admissible, as well as opinions that Benowitz actually offered at trial. According to Hughes's appellate briefs, the trial court permitted Benowitz to testify that (1) Hughes was impulsive on the day of the accident due to her methamphetamine use; and (2) Hughes likely had prior brain damage due to her drug use. The court did not make those rulings. As we have discussed, during the initial hearing on plaintiff's in limine motion, the court precluded Benowitz from offering an opinion about whether Hughes used drugs on the day of the accident; and after the 402 hearing, the court ruled that any speculative opinion about Hughes's drug use near the time of the accident would be inadmissible under *Hernandez*. Consistent with these rulings, Benowitz did not discuss Hughes's conduct at or near the time of the accident during his direct trial testimony, nor was he asked to disclose his opinion about whether Hughes was a chronic methamphetamine user. Moreover, Hughes cannot rely solely on testimony

19

elicited by her own trial counsel and admitted without objection as the basis for claiming reversible error on appeal. (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 745.) With these caveats, we address Hughes's claim that Benowitz's testimony was inadmissible under *Sanchez* and *Sargon*.

In *Sanchez*, 63 Cal.4th 665, our state Supreme Court held that "[i]f an expert testifies to case-specific out-of-court statements to explain the bases for his opinion, those statements are necessarily considered by the jury for their truth, thus rendering them hearsay." (*Id.* at p. 684.) " 'Like any other hearsay evidence,' such statements must be 'properly admitted through an applicable hearsay exception' or 'an appropriate witness.' [Citation.] Otherwise, the admission of such statements constitutes error. (*People v. Camacho* (2022) 14 Cal.5th 77, 127 (*Camacho*), quoting *Sanchez*, at p. 684.)

Hughes contends that Benowitz's testimony should have been excluded under *Sanchez* because his entire opinion was based on hearsay contained in Hughes's medical records. But this argument misconstrues *Sanchez*, which does not preclude experts from relying on hearsay, but only from disclosing inadmissible hearsay to the jury. Under *Sanchez*, " '[a]ny expert may still rely on hearsay in forming an opinion, and may tell the jury in general terms that he did so.' " (*Camacho*, *supra*, 14 Cal.5th at p. 128, italics omitted.) "The limitations that *Sanchez* placed on expert testimony concern case-specific information that an expert relates to a jury, not materials upon which the expert relies. [Citations.] Regarding the sources upon which the expert relies, *Sanchez* recognizes that the expert 'may still rely on hearsay' and the expert is permitted 'to relate generally the kind and source of the "matter" upon which his opinion rests.' " (*Ibid.*, italics omitted.)

The record shows that the trial court followed *Sanchez* by striking testimony from Benowitz that would have related case-specific information to

20

the jury about medical records documenting Hughes's methamphetamine use. Moreover, the jury was instructed to disregard the stricken testimony and not to consider it for any purpose. Even in criminal cases, such an admonition is generally considered sufficient to cure the error absent evidence to the contrary. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428–1429.) Hughes makes no effort to show the admonition was insufficient under the circumstances of this case.

Hughes also mistakenly relies on *Sargon*, *supra*, 55 Cal.4th 747. The *Sargon* court held that trial courts have a gatekeeping role, which requires them to exclude expert opinion testimony that is " 'based "on assumptions of fact without evidentiary support," ' " or on guesswork and conjecture. (*Id.* at p. 770.) The trial court must " 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.' " (*Id.* at p. 772.)

Hughes contends the trial court violated *Sargon* by admitting Benowitz's opinion that Hughes was a chronic methamphetamine user. But Benowitz did not testify during his direct trial testimony that Hughes was a chronic methamphetamine user. Hughes fails to acknowledge this fact, or that her *Sargon* claim is based exclusively on the record of Benowitz's testimony *at the section 402 hearing*.

Hughes appears to contend that, in light of the trial court's ruling at the section 402 hearing, her counsel had no choice but to address the drug use issue head on. We question the logic of this argument, since it was after Benowitz *completed* his direct testimony that plaintiff's counsel elicited opinions about Hughes's drug use. Regardless, Hughes's contention that the court violated *Sargon* during the section 402 hearing fails on its merits.

21

Hughes contends that the trial court violated its gatekeeping obligation by permitting the defendants' medical expert to base his opinion on the plaintiff's medical records. We think not. As a general rule, "[a]n expert may rely on otherwise inadmissible hearsay evidence provided the evidence is reliable and of the type that experts in the field reasonably rely upon in forming their opinions." (*People v. Yuksel* (2012) 207 Cal.App.4th 850, 856.) Medical records, although hearsay, are the type of records upon which medical experts rely in a negligence case. (See *Wicks v. Antelope Valley Healthcare Dist.* (2020) 49 Cal.App.5th 866, 876.) And, although Hughes takes the view that her own medical records were unreliable because they were from "many years prior" to the 2016 accident, Benowitz reportedly reviewed medical record from 2014 and 2015, which is close in time to the 2016 accident, and which contained diagnoses of *chronic* methamphetamine use.

Hughes mistakenly relies on *Hernandez*, *supra*, 13 Cal.App.5th 692. *Hernandez* was an appeal from a judgment holding a defendant driver liable for negligently causing a traffic accident during which the plaintiff suffered serious injuries. The appellate court found that the trial court had properly acted as a gatekeeper under *Sargon* by excluding a defense expert's opinion that the plaintiff was under the influence of marijuana at the time of the accident because the opinion was speculation. (*Hernandez*, at p. 699) In this case, the trial court expressly followed *Hernandez* by precluding expert testimony as to whether Hughes was under the influence of anything on the day of the accident. By contrast, the foundation for Benowitz's opinion about the effects of plaintiff's chronic drug use was not based on speculation but on plaintiff's own medical records.

22

## D. Evidence Rulings During Trial

Hughes challenges evidentiary rulings the court made while witnesses were testifying at trial. We review these rulings for abuse of discretion. (*Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 258.) An evidentiary error is not a ground for reversal absent a miscarriage of justice and a showing that it is reasonably probable a result more favorable to the appealing party would have been reached in the absence of the error. (*Ibid.*)

### 1. Exclusion of Libeu's "Hearsay" Testimony

At trial, Libeu was cross-examined about the statement he gave to Officer Gillette at the accident scene. Plaintiff's counsel began by asking whether there was "anything else going on around" Libeu when he was giving his statement. Libeu responded that "obviously" there were other people there because of the accident, including first responders and "a small crowd of people." Libeu continued: "And someone behind us, as soon as I gave my initial statement, started yelling, 'Oh, the light was red. Oh, he ran the red light,' which interrupted our interview and we had to shift to the side.'" After Libeu finished this answer, plaintiff's counsel objected and moved to strike "the hearsay that was just interjected." The objection was sustained, and the court struck the portion of Libeu's answer that recounted what the bystander had yelled.

On appeal, Hughes characterizes Libeu's statement as hearsay that was false, fabricated, and an unfair "surprise tactic." She contends this testimony prejudiced her because it offered the jury an innocuous explanation as to why Libeu appeared unsure about the color of the light when Gillette interviewed him. First, Hughes did not raise these objections at trial, where her sole objection was that the testimony was hearsay. (See e.g., *People v.*

*Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal"].) Second, we do not agree that this testimony was hearsay. Libeu did not testify as to the bystander's statement "to prove the truth of the matter stated" (Evid. Code, § 1200), as Libeu sought to prove that the light was *not* red. And third, even if this testimony were somehow objectionable, it was stricken, and we assume that the jury followed the court's admonition to disregard it. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 722.) We accordingly reject Hughes's speculation that the jury ignored the admonition and used this evidence to reach a defense verdict.

### 2. Dr. McCoy's Testimony About Prior Accidents

Defendants' orthopedics expert, Dr. McCoy, testified over a relevance objection that he reviewed medical records pertaining to Hughes's two prior bicycle accidents. Under cross-examination, McCoy agreed with plaintiff's counsel that these prior accidents involved different "issues" and had "nothing to do with the injuries that [Hughes] sustained here." On redirect, defense counsel asked about the 2014 accident, which involved a significant injury to Hughes's right leg, and asked McCoy whether that injury had any bearing on this case, which involves a left leg injury. Overruling plaintiff's relevance objection, the court permitted McCoy to describe the right leg injury. McCoy also testified that some of the restrictions that he recommended to Hughes after examining her were because of her prior right leg injury.

On appeal, Hughes contends that the trial court committed reversible error because (1) the accident in which she injured her right leg was irrelevant; and (2) the defense used McCoy's testimony to make improper and

24

prejudicial arguments.  First, Hughes fails to show that the prior accident was irrelevant.  Evidence of a former injury can be relevant and admissible to show that a plaintiff's current condition is partially attributable to that prior injury.  (*Johnson v. Matson Navigation Co.* (1958) 163 Cal.App.2d 336, 338.)  In this case, for example, McCoy testified that when he examined Hughes, she had excessive fluid in both legs, some of which could be attributable to the earlier accident and some to chronic disease, but that the more substantial swelling in the left leg was explained by the current injury.  McCoy also testified that his recommendations about future care and treatment were not based solely on the injuries caused by the current accident but also addressed Hughes's right leg injury and unrelated health issues.

Second, even if admitting testimony about the earlier leg injury were error, Hughes fails to show prejudice.  Her contention that this testimony portrayed her as "habitually at fault" is speculation; she cites no evidence that defendants ever made this argument, or that fault in the earlier accidents was ever discussed.  And she does not provide any record support for her contention that the defendants' use of McCoy's testimony violated an in limine order excluding evidence about Hughes's " 'sociopathic behavior and lifestyle.' "

### E.  Jury Instructions

Hughes contends that the trial court erred in denying her request to instruct the jury regarding two issues that were supported by the evidence.  "A party is entitled to have the jury instructed on each viable legal theory supported by substantial evidence if the party requests a proper instruction."  (*Orichian v. BMW of North America, LLC* (2014) 226 Cal.App.4th 1322,

1333.)  "We independently review claims of instructional error viewing the evidence in the light most favorable to the appellant."  (*Ibid*.)

### 1. Additional Background

On February 28, 2023, after plaintiff rested her case, the court held a hearing to discuss jury instructions.  One issue addressed was whether Hughes was entitled to CACI No. 420, which is one of several standard instructions that can apply when a party relies on a presumption of negligence arising from violation of the law.  As we have discussed, both parties relied on negligence per se theories.  The defense argued that the presumption of negligence applied to Hughes based on evidence that she violated Vehicle Code provisions that require bicyclists to comply with rules applicable to drivers, including provisions that require drivers to signal before turning and to make turns only when it is safe to do so.  (Veh. Code, §§ 21200, subd. (a), 22107, 22108. 21650.1, 21650, subd. (g).)

Hughes did not object to instructing the jury regarding defendants' negligence per se theories, but she argued that she was entitled to a modified version of CACI No. 420 that expressly told the jury that any violation of the Vehicle Code would be excused if Hughes proved that she made a left turn inside the crosswalk.  At the jury instruction hearing, plaintiff's counsel argued that an excuse instruction was supported by evidence that Hughes did not begin making a turn until she was fully in the crosswalk, at which point she was "excused from a violation of making a turn across lanes."  The trial court rejected plaintiff's theory.  It ruled that the Vehicle Code permits a bicyclist to use a crosswalk, but it does not excuse any violation of the left-turn rules that apply to a bicyclist.  Accordingly, the court ruled that it would not give CACI No. 420.

26

Later during the hearing, the court and counsel discussed instructions pertaining to Hughes's damages claims. Hughes requested CACI No. 3927, which provides that a plaintiff is not entitled to damages for a preexisting condition but that she is entitled to damages for a physical or emotional condition that was made worse by the defendant's wrongful conduct. (CACI No. 3927.) The trial court found that CACI No. 3927 did not apply, as plaintiff had not shown aggravation of a preexisting condition. However, the court did give CACI No. 3928, which instructs the jury that a plaintiff may recover all damages caused by the wrongful conduct of the defendant even if the plaintiff was more susceptible to injury than a normally healthy person would have been (CACI No. 3928), finding that Hughes "had some physical history that made her susceptible, unusually susceptible in this case."

## 2. Analysis

We begin with Hughes's contention that the court erred by refusing to give CACI No. 420. This instruction provides that a violation of the law is excused in specified circumstances, such as when a party was "not able to obey the law" notwithstanding that he or she used "reasonable care." (CACI No. 420(b).) This instruction may also be given when there is some other "reason excusing or justifying noncompliance." (CACI No. 420(e), italics omitted.) But it should not be given unless some special circumstance exists to excuse the violation and rebut the presumption of negligence per se. (*Baker-Smith v. Skolnick* (2019) 37 Cal.App.5th 340, 345.) Hughes does not contend that any circumstance specified in CACI No. 420 applies and does not identify a special circumstance that would justify giving the instruction.

Hughes appears to believe she was entitled to an excuse instruction because there was evidence that she was in a crosswalk, and as a bicyclist she was entitled to use the crosswalk. This argument misconstrues Vehicle

27

Code section 21650, subdivision (g). Under this statute, a bicyclist is not precluded from operating a bicycle along a crosswalk "where the operation is not otherwise prohibited by this code or local ordinance." Section 21650, subdivision (g) does not excuse bicyclists from violating traffic laws so long as they utilize a crosswalk to do so. Hughes's only other argument is that an excuse instruction was supported by evidence that she did not actually make an illegal left turn. But if the jury found that Hughes did not make an illegal left turn, the presumption of negligence would never arise in the first place, and no excuse instruction would apply.

Turning to the damages instructions, Hughes argues that she was entitled to CACI No. 3927 as well as CACI No. 3928 because there was evidence that she had a preexisting brain condition due to her long-term methamphetamine use. Hughes did not introduce evidence, however, connecting her drug-related brain condition to the damages she suffered as a result of her TBI.

Importantly, Hughes's jury instruction arguments fail for the additional reason that she fails to show prejudice. Improper instruction in a civil case is prejudicial only if there is a reasonable probability that in the absence of the error a result more favorable to the appealing party would have been reached. (*Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 340–341; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.) In this case, because the jury found that Libeu was not negligent, the jury did not decide whether Hughes was negligent or make any finding as to her damages. Since the instructions Hughes discusses on appeal are unrelated to the dispositive finding that Libeu was not negligent, it is not reasonably probable Hughes would have obtained a more favorable result if those instructions had been given.

### F. Jury Misconduct

Hughes contends that the trial court erred in denying her a new trial due to juror misconduct. " ' "[I]n reviewing an order *denying* a motion for new trial based on jury misconduct, as distinguished from an order *granting* a new trial on that ground, a reviewing court has a constitutional obligation . . . to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial." ' " (*People v. Cumpian* (1991) 1 Cal.App.4th 307, 311.) In conducting our independent review, however, we "still give deference to the trial court's discretionary determinations." (*Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 912.)

### 1. Additional Background

In her new trial motion, Hughes argued the jury committed misconduct by relying on outside information to find that Libeu was not negligent. Hughes proffered declarations from three jurors as proof that several jurors relied on outside information about the intersection where the accident occurred to conclude that Libeu's conduct was reasonable under the circumstances. Hughes argued that the declarations established prejudice as a matter of law.

Juror A.S. stated in his declaration that he lived near the intersection where the accident occurred (hereafter the intersection), and that he told other jurors that he often drove through the intersection at 35 miles per hour because he thought it was safe to do so. A.S. also stated that other jurors discussed their outside driving experiences, including personal experiences driving through the intersection. Juror N.H. confirmed in his declaration that A.S. shared his experiences driving through the intersection and his opinions about driving over the speed limit at that location. N.H. also stated

29

that other jurors discussed their experiences driving through the intersection and their opinions about whether Libeu's speed was reasonable. Juror M.R. attested that she witnessed other jurors openly discuss their personal experiences of driving through the intersection and their personal opinions about whether driving 33 to 35 miles per hour was a reasonable speed under the circumstances.

In their opposition to the new trial motion, defendants argued juror misconduct did not occur. According to defendants, the law precludes jurors from conducting independent investigations of the scene but does not preclude them from discussing their general knowledge of the scene, garnered prior to trial. Defendants argued that the juror declarations submitted by Hughes were not evidence of misconduct because they did not show that any juror concealed prior knowledge about the intersection, or that the jurors decided the case based on their own experiences rather than the trial evidence.

The trial court found that Hughes failed to carry her burden to show that prejudicial juror misconduct occurred because jurors are permitted to draw on their own experiences while deliberating. (Citing *People v. Allen & Johnson* (2011) 53 Cal.4th 60.) There was no evidence that the jurors relied on specialized information obtained from an outside source or that they conducted an experiment at the scene. The declarations showed that during deliberations, some jurors related their own driving experiences and made decisions informed by their own experiences. The declarations did not show that other jurors were persuaded by anything other than the trial evidence, the court found. Juror M.R., the lone dissenting juror, believed that other jurors were influenced by the discussions of others' experiences, but that was only her subjective view, and she offered no factual basis for purporting to

30

know the state of mind of the other jurors, the court concluded.  The court also found Hughes failed to make any showing of prejudice.  Rejecting plaintiff's contention that the lack of opposing declarations resulted in a presumption of prejudice, the court found that the declarations lacked any specific facts to support a reasonable inference that actual misconduct occurred.

### 2. Analysis

Hughes contends the judgment must be reversed due to juror misconduct because her juror declarations (1) establish that the jury based its decision on outside information rather than the trial evidence; and (2) gave rise to a presumption of prejudice, which was not rebutted or rebuttable on this record.  We reject both prongs of this argument.

As a preliminary matter, Hughes fails to distinguish and disregard improper information contained in the juror declarations.  "Evidence of jurors' internal thought processes is inadmissible to impeach a verdict.  [Citations.]  Only evidence as to objectively ascertainable statements, conduct, conditions, or events is admissible to impeach a verdict.  [Citations.]  Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process." (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124–1125; see Evid. Code, § 1150, subd. (a).)  Hughes violates these principles by recounting and relying on improper material in the juror declarations including, for example, statements by Juror M.R. that the personal opinions and experiences of some jurors persuaded others to vote that Libeu was not negligent.  This evidence was inadmissible, and we do not

31

consider it or any other statements in the declarations that reveal the internal thought processes of jurors.

The juror declarations do contain admissible evidence that some jurors made statements about their prior experiences driving and, in particular, driving through the intersection. Hughes argues this evidence proves that misconduct occurred, but she fails to support this claim with pertinent authority. "Jurors do not enter deliberations with their personal histories erased, in essence retaining only the experience of the trial itself." (*Moore v. Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 741.) Courts have concluded that evidence a juror shared a personal experience during deliberations does not constitute misconduct, absent proof that other jurors decided the case based on the juror's experience *rather* than on the basis of the evidence presented at trial. (*Id.* at pp. 741–742; *Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 819.) In this case, no juror provided evidence that the jury disregarded the trial evidence.

As the trial court observed, the jury was required to discuss whether or not driving through the intersection at a speed of 35 miles per hour was negligent. The jurors' views of evidence addressing this disputed issue were " 'necessarily informed by their life experiences.' " (*People v. Steele* (2002) 27 Cal.4th 1230, 1265 (*Steele*).) And although some jurors shared personal experiences, there is no evidence that any juror claimed expertise or specialized knowledge regarding what constitutes a reasonable speed. (*Id.* at pp. 1265–1266.) Instead, admissible portions of the declarations show that some jurors brought their life experiences to bear when expressing their opinions on that subject and their views about the trial evidence.

Hughes relies on cases in which jurors conducted independent investigations *during* trial and injected that information into the

32

deliberations. (*Lankster v. Alpha Beta Co.* (1993) 15 Cal.App.4th 678, 682; *People v. Southern California Edison Co.* (1976) 56 Cal.App.3d 593, 598.)[2] The evidence before us shows instead that jurors drew on their own life experience in assessing whether the trial evidence of Libeu's conduct constituted negligence. That is not misconduct.

Thus, we reject Hughes's contention that the juror declarations created a presumption of prejudice that defendants failed to rebut. Such a presumption arises only upon a showing that misconduct actually occurred. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417.) Contrary to Hughes's appellate arguments, we will not presume that jury misconduct occurred. Our presumption on appeal is that the judgment is correct unless the appellant proves otherwise. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Overlooking this settled rule, Hughes argues that the declarations are proof of misconduct because they do not "mention" trial evidence that Libeu was "innocen[t]." This argument ignores that evidence of a juror's subjective thought processes in deciding whether Libeu was negligent would have been inadmissible. Thus we decline to presume misconduct from the absence of such evidence.

In her reply brief, Hughes argues that she proved misconduct under the holding of *Smith v. Covell* (1980) 100 Cal.App.3d 947, 952 (*Smith*). We disagree. *Smith* was a negligence action arising out of an automobile accident in which the defendant conceded liability and the absence of contributory negligence, and trial was conducted solely on the issue of damages for injuries suffered by the plaintiff driver and loss of consortium

---

[2] Hughes also relies on unpublished cases in her appellate briefs. We deny respondents' motion to strike those portions of the briefs, but we do not consider the unpublished authority upon which Hughes relies. (See Cal. Rules of Court, rule 8.1115(a).)

33

suffered by her husband.  (*Id.* at p. 951.)  The jury awarded the driver $10,000 and entered a verdict of zero as to her husband, which was reversed on appeal due to multiple errors, including that juror declarations submitted in support of the plaintiffs' new trial motion detailed acts of juror misconduct by multiple jurors.  (*Id.* at pp. 952–955.)  During voir dire panel member Cox, who later became foreman, disclosed that he had a back condition that was aggravated by a baseball injury he suffered years before trial.  When questioned about the injury, Cox represented he would base his decision solely on the trial evidence as distinguished from his own experience and problem.  (*Id.* at p. 952.)  However the juror declarations showed that Cox discussed details about his injury with other jurors before and during deliberations, telling them that when he injured his back, it " 'went out right away,' " and " 'hurt right away.' "  (*Ibid.*)  The *Smith* court found this was misconduct because it constituted improper communication of information from a source outside the evidence that likely influenced the verdict, and it was also evidence of Cox's concealed bias.  (*Id.* at pp. 952–953.)  The *Smith* court also found that the juror declarations documented other instances of misconduct, including by a juror who offered "outside evidence as to the impact of personal injury litigation on insurance rates."  (*Id.* at p. 955.)  In addition, several jurors who represented during voir dire that they would follow instructions regarding the law pertaining to loss of consortium damages subsequently disclosed during deliberations that they disagreed with the law and would not follow it.  (*Id.* at p. 955.)  Ultimately, the *Smith* court held that "several undisputed acts of juror misconduct," viewed individually or collectively, deprived plaintiffs of a fair and impartial jury trial.  (*Ibid.*)

Hughes's reply brief posits that she proved misconduct because *Smith* establishes the governing "standard" that any discussion of outside information constitutes juror misconduct "unless harmless." We reject this belated theory. To begin with, the misconduct in *Smith* was multi-faceted and involved multiple jurors. Cox, for example, concealed bias during jury voir dire and then violated his oath by disclosing information about his back injury to other jurors. No concealment occurred here, as best we can determine. Apparently, prospective jurors were not asked if they had ever driven through the intersection or had any preconceived opinion about what was a reasonable speed to drive through it.

Hughes argues that a rule deeming all discussion by jurors of outside experience to be misconduct is the better standard and the one we should apply here. We disagree. As our Supreme Court has found, it is both "appropriate, [and] even inevitable" that jurors will use their personal backgrounds to analyze the evidence. (*Steele*, *supra*, 27 Cal.4th at p. 1266.) "Moreover it would be an impossibly high standard to permit" jurors to express an opinion on the evidence "without relying on, or mentioning, their personal experience and background." (*Id*. at p. 1267.) In this case, admissible portions of the juror declarations show that some jurors mentioned personal experiences when expressing their opinion about the trial evidence. As that evidence does not establish that misconduct occurred, the trial court did not err in denying Hughes a new trial.

## G. Evidentiary Decisions Relating to Damages

Hughes challenges other evidentiary decisions that pertain exclusively to her damages claims. In one set of rulings, the trial court excluded expert evidence pertaining to Hughes's TBI in light of events that had occurred during discovery, and in another instance, the court precluded Hughes's

35

expert from opining as to whether wearing a helmet would have decreased her injury. We address Hughes's challenges to these rulings only briefly because even if some error were shown, which we do not find, Hughes cannot establish prejudice. Because the jury found no liability and we have, in earlier sections of this opinion, found no basis for disturbing that verdict, there is no reasonable probability that admitting the evidence would have afforded Hughes a more favorable outcome.

First, Hughes contends the trial court erred by excluding her claim for neuropsychological injuries associated with her TBI. In fact, the court did not exclude this claim, although it did exclude testimony from Hughes's neuropsychology expert, Dr. Epperson, because Hughes failed to complete an independent medical exam (IME) prior to the close of discovery. (See Code Civ. Proc., § 2032.320.) The court had found good cause to compel Hughes's attendance at the IME in order to determine, among other things, whether the emotional injuries to which Dr. Epperson would testify were related to a preexisting condition or arose solely from the accident. Despite the court's order, Hughes did not complete an IME, so the trial court granted defense in limine motions to exclude the testimony of Dr. Epperson and to not permit any different expert to convey Dr. Epperson's opinions to the jury. None of this evidence, which went only to the extent of the injury Hughes suffered in the accident, could have affected the jury's dispositive determination that Libeu was not negligent in causing the accident.

The second ruling that Hughes challenges occurred during the direct examination of her accident reconstruction expert, Mr. Smith. Plaintiff's counsel asked Smith whether the fact that Hughes was not wearing a helmet made any difference "biomechanically." Defense counsel objected on the ground that this question went beyond the scope of Smith's deposition

36

testimony, and after reviewing a deposition excerpt that plaintiff's counsel produced, the court sustained the objection.  Regardless, the jury never had occasion to consider whether Hughes's failure to wear a helmet contributed to the extent of her own injuries, so there could have been no prejudice from this ruling.

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

TUCHER, P. J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.


*Hughes v. Libeu et al.*  (A168172)